Eugene FLEMING, Individually and for the Use and Benefit of his minor daughter, Mary Evelyn and Mary Ellen Rayford, wife of Eugene Fleming, Appellants,

v.

MICHIGAN MUTUAL LIABILITY COMPANY et al., Appellees.

No. 21995.

United States Court of Appeals Fifth Circuit.

June 28, 1966.

Rehearing Denied July 29, 1966.

Frank S. Bruno, New Orleans, La., for appellants.

David W. Robinson, Baton Rouge, La., for appellees, Watson, Blanche, Wilson, Posner & Thibaut, Baton Rouge, La., of counsel.

Before RIVES and GEWIN, Circuit Judges, and ALLGOOD, District Judge.

GEWIN, Circuit Judge:

This is an action in tort for the recovery of damages against a liability insurer for the alleged negligence of its insured and the performance of surgery without consent, arising out of a skin graft transplant, technically termed a "homograft" from the person of the plaintiff-mother to her seriously injured minor daughter; and in addition, for alleged negligent treatment of the mother and the child. From a jury verdict and judgment in favor of the insurer in the United States District Court for the Eastern District of Louisiana, plaintiffs appeal.[1]

1. In the trial court the case was styled: "EUGENE FLEMING, Individually and for the use and benefit of his minor daughter, MARY EVELYN, and MARY ELLEN RAYFORD, Wife of Eugene Fleming, -vs- MICHIGAN MUTUAL

The plaintiffs specify error on the part of the trial court in the granting and refusal of certain requested charges. In order to bring their contentions into proper focus a statement of the facts and a discussion of portions of the evidence are necessary and appropriate.

Mary Evelyn Fleming, the minor daughter of Mary Ellen Fleming, entered the Baton Rouge General Hospital on January 15, 1962, for the treatment of third degree burns covering approximately 55 percent of her body sustained in an accident at her home. At the time of her admission, there was serious professional doubt whether the child would recover from these injuries. She was described as resembling "a little baked potato" by one of the attending physicians, and it was readily apparent that she would need the very best in medical care and attention. The child's pediatrician, Dr. Leon Bombet, examined her in the emergency room shortly after admission and immediately called in Dr. Leonard H. Stander, a highly qualified surgeon in the field of burn therapy. After a preliminary examination by Dr. Stander, it became obvious to him that treatment of the child would require extensive homografts in order to save her life. A "homograft" is distinguished from an "autograft" in that the latter procedure involves a skin transplant from another portion of the patient's own body, whereas the former involves a skin transplant to the patient from a separate donor.

Because of the nature of Mary Evelyn's burns and also because of the considerable body area affected, only 10 percent of the skin on her own person was immediately available as a donor site, and this skin was soon consumed after Dr. Stander had performed two skin grafts upon her. Approximately 30 days after the initial treatment, Dr. Stander felt he needed additional skin because "the child was very sick in that she was very septic. She had high fever, very rapid pulse, was cross, would not talk to anybody and she was going downhill in spite of all the measures we had used. * * " Because of the need for an additional donor, Dr. Stander called in the parents for the purpose of discussing with them the possibility of donating skin for their child. It was decided that several sheets of skin be taken from the mother rather than the father because, "the father said he had to work and instead of laying him up, it would be best that the mother give it." At this point the problem of varicose veins, from which Mrs. Fleming was suffering, was discussed by her and the doctor. The physician told her that he did not consider the varicose veins in her legs to be a serious impediment to the homograft operation. Mrs. Fleming testified that during this conversation with Dr. Stander, or shortly thereafter, she requested him not to remove any skin from her inner thighs. Whether this request was made known to the doctor, and whether he understood these instructions and told her he would comply with her wishes was a point in sharp dispute. Subsequent to the above conversation, however, Mrs. Fleming signed the necessary consent form and the homograft operation was scheduled and performed by Dr. Stander.

During the 30-day period which elapsed between the date of Mary Evelyn's admission and the date of the homograft operation performed on her mother, the record is not clear as to the reason for the delay. The plaintiffs urgently contend that Dr. Stander should have made a determined effort to arrange a postmortem homograft (using skin from a cadaver), in lieu of requesting skin from the mother, and that his failure to do so "subjected the mother to this needless operation solely for his own convenience." There was abundant testimony in the

LIABILITY CO. and ARGONAUT INSURANCE CORP."
Michigan Mutual Liability Company is the insurer of Dr. Leonard H. Stander, and Argonaut Insurance Corporation is the insurer of Baton Rouge General Hospital. The court granted a directed verdict as to Argonaut Insurance Corporation, and the question of its release from the case is not an issue on this appeal.

record, however, to support the finding that a post-mortem homograft was rarely used in the Baton Rouge area, was often dangerous from a medical point of view, and required strict compliance with various rules and regulations which usually consumed a great deal of time.

The homograft operation was completed on the mother, and she was discharged from the hospital two days later. Again the question of negligence in the treatment of the mother arose in regard to the doctor's alleged disregard of her welfare, his failure to inform her of the method she should use in the eventual removal of the bandages from her legs, and in the alleged "complete abandonment" of her after the homograft surgery.

Mrs. Fleming claimed she experienced great difficulty in removing the bandages; and when they were finally removed, she discovered that Dr. Stander had not only removed skin from her outer thighs, but had also taken skin from her inner thighs contrary to her instructions. Infection developed in the area of the surgery and this fact led to a dispute as to whether Mrs. Fleming's thighs had become septic as a result of the operation performed by Dr. Stander and because of his alleged disregard of her general well being.

In the meantime, the minor daughter had shown some improvement and had been released from the hospital. As additional grafts became necessary later in the treatment process, it was thought that the donor sites on the child's own body had healed to the extent that further autografts could be made. Arrangements were thereupon completed for Mary Evelyn to be readmitted to the Baton Rouge General Hospital in August, 1962, but on the appointed date the parents informed Dr. Stander that they preferred to remove her to the Charity Hospital in New Orleans. After her reception at Charity Hospital she continued to improve and eventually experienced a good recovery. Plaintiffs strongly contend that the child "miraculously" recovered once she came under the care of the physicians at New Orleans, attempting by this assertion, we presume, to support their contention that the child was not treated in a proper manner while under the care of Dr. Stander. However, competent medical testimony given by the physicians from both hospitals failed to support to any degree the contentions of the plaintiffs. The record is indelibly clear on the point that all medical experts, and even the father, agreed that Dr. Stander's treatment of Mary Evelyn saved her life and was in all respects proper.[2]

The jury was the trier of facts, the judge of the credibility of the witnesses, and it was the jury's duty to resolve conflicts in the evidence and draw reasonable inferences therefrom. All factual issues were decided contrary to the contentions of the plaintiffs.

We have reviewed the record thoroughly and are completely convinced that the verdict of the jury was amply supported by substantial evidence, and it must not be disturbed unless the trial court failed to present the issues to the jury with proper instructions, as contended by the plaintiffs.

As indicated above, the only errors specified relate to the court's instructions to the jury. It is argued that the court should have given the plaintiffs' special requested charges numbered 4, 5, 6 and 7.[3] Further, it is contended that the

2. The following is from the testimony of Eugene Fleming, the child's father:

"Q. Is it true that when she was first taken to the hospital there was a serious question as to whether or not she was going to live?

"A. Yes, I think so.

"Q. Is there any doubt in your mind that Doctor Stander through his treatment actually saved your child's life?

"A. How do you say that?

"Q. Do you agree—I am asking you the question—do you agree that Doctor Stander actually saved your child's life?

"A. I would say yes."

3. The plaintiffs' special requested charges are as follows:

*Number Four (4):*

"In the absence of an emergency, a

court erred in giving the following charge to the jury:

"In order for you to return a verdict for the plaintiffs or either of them, based upon negligence or malpractice, you must find that the negligence or malpractice had been proved by a preponderance of the evidence by the plaintiff, and you must also find that the plaintiff has proved by a preponderance of the evidence that such negligence or malpractice was also a proximate cause of damage or injuries to the plaintiffs, for which damages are justified."

It is a fundamental rule that a trial court is not required to give every charge requested or to instruct the jury in the particular manner or form requested by the parties, even though such instructions state correct principles of law, if the subject matter of such requested special instructions was sufficiently covered by other instructions from the court. Messer v. L. B. Foster Company (5 Cir. 1958) 254 F.2d 412; Gerhart v. Henry Disston & Sons, Inc. (3 Cir. 1961) 290 F.2d 778; Southern R. Co. v. Haynes (5 Cir. 1961) 293 F.2d 291; Wiper v. Erie Sand S.S. Co. (2 Cir. 1961) 293 F.2d 491; Byrne v. Shell Oil Co. (7 Cir. 1961) 295 F.2d 797; Miller v. Brazel (10 Cir. 1962) 300 F.2d 283; Mathes & Devitt, Federal Jury Practice & Instructions, (West, 1965) § 5.01, et seq., p. 50.[4]

The plaintiffs contend that if the court had instructed the jury as requested in the charges relating to consent, "they could have correctly directed their attention away from the negligence aspect of the cause, and returned a verdict for the appellants [plaintiffs] if they found the operation to be without consent regardless of any negligence on the part of the defendant." In the circumstances here present there is little doubt that a physician is required to obtain the patient's consent before proceeding to operate. See Rogers v. Lumbermens Mutual Casualty Co. (C.A.La. 2nd Cir.) 119 So.2d 649 (1960); Shehee v. Aetna Casualty & Surety Co. (W.D.La.) 122 F.Supp. 1 (1954). The court fully instructed the jury on the matter of consent and discussed the subject several times during the course of his instructions. The following is from the court's charge:

"If you find that Doctor Stander was previously instructed by Mary Ellen Fleming not to take skin from certain areas of her thighs and if, despite

surgeon may not perform an operation different in kind from that for which consent was given, or an operation involving risks and results not contemplated."

*Number Five (5):*

"That a surgeon who performs an operation different in kind from that for which consent was given, or an operation involving risks and results not contemplated commits trespass against the patient in the nature of assault and battery, and is liable to the patient in damages even though there is no breach of medical ethics or any nature or degree of negligence or malpractice on the part of the defendant surgeon."

*Number Six (6):*

"Under the Louisiana law, a physician or surgeon on undertaking an operation or treatment is under the duty, in the absence of an agreement limiting the service, continuing his attendance after the operation or first treatments, as long as the case requires attention."

*Number Seven (7):*

"Under the Louisiana law, negligence can be established without the testimony of expert witnesses and therefore, the plaintiff does not have to produce an expert to testify in its behalf in order to prove its case."

4. See Section 5.05, p. 65 wherein it is stated:

"The federal judge need not give instructions in any particular form. Although it is his obligation to instruct on the legal standards to be applied in determining the fact issue submitted, it is not error for the court to fail to adopt the precise words suggested in a proposed instruction so long as the substance of the suggested instruction is fully stated. Indeed, as observed elsewhere it is unwise for the court to adopt indiscriminately counsel's suggested terminology in proposed instructions because much of the time the proposals are couched in the language of the advocate, not the judge, and do not therefore constitute a fair jury charge."

those instructions, the doctor proceeded to take skin from those areas, he would be liable to her for whatever damage you might find to have been proximately caused thereby."

\* \* \* \* \* \*

"Thirdly, you will have to decide whether or not Doctor Stander, aside from any negligence, as we have described it—whether or not Doctor Stander did take skin from certain portions of the thighs of Mary Ellen Fleming contrary to her specific instructions and then, if you find that he did, then you must decide whether or not his doing so resulted in any injury or damage to Mary Ellen Fleming and, if you find that it did, you must then decide how much, put a dollars and cents value on that for whatever amount you may decide."

It is our conclusion that the court properly instructed the jury on the subject of consent, and the plaintiffs' argument is not well founded.

The requested Charge No. 6 deals with the issue of continued treatment. The court fully instructed the jury with respect to the duty, and the required skill and care of a physician. He defined negligence and malpractice both in terms of omission and commission. We consider his instructions on the subject sufficient. The plaintiffs did offer testimony tending to prove a lack of care on the part of Doctor Stander, but there was also evidence to the contrary offered on behalf of the doctor. The jury resolved that issue contrary to the contentions of the plaintiffs after adequate instructions from the court.

Finally, the plaintiffs complain of the failure to give Charge No. 7 with respect to the production of an expert to testify on their behalf. The court carefully instructed the jury as to the issues involved, the burden of proof and thoroughly explained the role of an expert in the trial of a case of this kind. Moreover, the plaintiffs did call an expert witness to testify on their behalf. The effect of his testimony, based upon his treatment and observations of the child-plaintiff,

was that she had received proper medical care before her admission to the Charity Hospital in New Orleans, and considering the history of the injuries and their nature and extent, she had been the recipient of good and skillful medical care from Doctor Stander.

Although the main thrust of the plaintiffs' argument relates to the question of consent, we have carefully considered all of their contentions and find them without merit. We conclude that the trial court properly instructed the jury and that the verdict of the jury was amply supported by substantial and positive evidence.

The judgment is affirmed.