Edgar FREIMANIS, Plaintiff-Appellant,

v.

SEA–LAND SERVICE, INC. and Department of Highways of the State of Louisiana, Defendants-Appellees.

No. 80–3441
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 4, 1981.

Wayne H. Carlton, Jr., New Orleans, La., for plaintiff-appellant.

Gelpi, Sullivan, Carroll & Laborde, Norman C. Sullivan, New Orleans, La., for Sea-Land Service, Inc.

Robert J. Jones, Baton Rouge, La., for Dept. of Highways.

Before GEE, RUBIN and RANDALL, Circuit Judges.

GEE, Circuit Judge:

This case arises out of a collision between the S/S MAYAGUEZ and the Danziger Bridge over the Innerharbor Navigation Canal in the City of New Orleans, Louisiana, on March 5, 1973. Sea-Land Services, Inc. ("Sea-Land") was the bare-boat charterer of the S/S MAYAGUEZ. The Danziger or Highway 90 Bridge was owned by the Department of Highways for the State of Louisiana (later reorganized under the name of Department of Transportation and Development) ("Department"). Edgar Freimanis was the boatswain of the MAYAGUEZ at the time of the collision.

At the time of the accident, the MAYAGUEZ made a regular ten-day run between Puerto Rico and New Orleans. In New Orleans the vessel docked at Sea-Land's Morrison Road Wharf. The vessel was accustomed to reaching the wharf by coming through the Mississippi River Gulf Outlet to the Innerharbor Navigation Canal and then beneath the L & N Railroad Bridge, the Danziger Bridge, to a turning basin, where it would turn and dock portside to the wharf. The vessel, nearly 500 feet in length and 75 feet wide, frequently experienced difficulty in passing beneath both the L & N and the Danziger Bridges. Quite often, due to the narrow passageway and the width of the vessel itself, it would collide with the fender systems of either or both bridges.

The procedure followed in approaching the Morrison Street Wharf from the Mississippi River Gulf Outlet was for the vessel to radio the tender of the L & N Railroad Bridge and advise him that the vessel was approaching. Once the bridge tender confirmed that he could open the L & N Bridge, the vessel would proceed and request the tender to contact his counterpart at the Danziger Bridge. Only on some occasions would there be direct contact between the vessel and the Danziger Bridge. The distance between the L & N Bridge and the Danziger Bridge was approximately 1,000 feet, so that as the stern of the MAYAGUEZ cleared the L & N Bridge, the bow would be about halfway to the Danziger

Bridge. In deference to vehicular traffic crossing it, the Danziger Bridge usually waited until the last minute to open. While the vessel was traversing the bridges, plaintiff Freimanis' duty station was at the bow of the vessel by the anchors with the second officer. The second officer was able to communicate with the captain and the pilot at the wheelhouse should it become necessary to lower the anchors. Once the vessel cleared the Danziger Bridge, Freimanis was to proceed to the gangway area in order to ready it for docking. One gangway was on the port side of the vessel, under the port wing of the vessel's superstructure. There was also a gangway on the vessel's starboard side. Once the vessel began passing through the L & N Bridge, it would be difficult for it to stop without damage should the Danziger Bridge fail for any reason to open.

On the day of the accident, the vessel cleared the L & N Bridge without incident. It then proceeded to the Danziger Bridge, which had been alerted to the vessel's approach. On this occasion the left or west span of the drawbridge failed to open fully because of a malfunctioning limit switch. As the wheelhouse and wings of the vessel approached the bridge, the captain, not realizing that the bridge had failed to open fully, began shouting out lower clearances until there was no clearance between the vessel and the fender system at all. The port wing of the vessel collided with the bridge, receiving severe damage. Not long after the collision, Freimanis, on deck to ready the gangway, was seriously injured by debris that fell from the damaged wing.

Plaintiff filed suit against Sea-Land and the Department of Highways of the State of Louisiana. The matter was set for trial before a jury in January 1979. The Department filed a motion to dismiss on December 1978, claiming eleventh amendment immunity. The trial court denied the motion, and trial was later continued until July 1979. Several days before trial, the state again urged the motion to dismiss. The case proceeded to trial before a jury, which returned a verdict in favor of plaintiff and against the Department in the amount of

$220,000. The jury found that Sea-Land was not negligent and that the vessel was not unseaworthy. The trial court ultimately set aside and vacated the verdict of the jury, finding that the state was entitled to immunity under the eleventh amendment to the United States Constitution, and denied Freimanis' motion for judgment n.o.v. or, alternatively, for a partial new trial as to Sea-Land. Freimanis now appeals to this court. For the reasons given below, we affirm the trial court in all respects.

### Eleventh Amendment Immunity

■ Appellant does not dispute established law that, in the absence of waiver or congressional abrogation of its immunity, a state is immune from suits brought in federal court by her own citizens, as well as by citizens of another state, under the eleventh amendment to the United States Constitution. *Parden v. Terminal Railroad Co.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Nor does appellant dispute the Department's claim that it is an integral and explicit part of the executive branch of the Louisiana state government, entitled to invoke the eleventh amendment limitation on the judicial power of the United States. Appellant argues instead that Congress abrogated Louisiana's eleventh amendment immunity for the purposes of this case through the Rivers and Harbors Appropriation Act of 1899 and the Bridge Act of 1906 or, alternatively, that the State of Louisiana waived its immunity by its participation in earlier proceedings before the district court.

The appellant urges us to reconsider our decision in *Intracoastal Transportation, Inc. v. Decatur County, Georgia*, 482 F.2d 361 (5th Cir. 1973), a case that counsel acknowledges is indistinguishable in all relevant respects from the case here, in light of recent developments. In that case, we held that Georgia did not subject itself to a suit for damages for alleged negligent operation of a drawbridge when it entered a federally regulated activity by building a bridge over navigable waters. After a thorough review of the authorities, including *Parden v. Ter-*

*minal Railway, supra,* and *Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare,* 452 F.2d 820 (8th Cir. 1971) (en banc), we concluded that a state's eleventh amendment immunity was not to be overridden lightly:

> It is no longer sufficient merely to show that a State has entered a federally regulated sphere of activity and that a private cause of action is created for violating the applicable federal provision, but in addition the private litigant must show that Congress expressly provided that the private remedy is applicable to the States.

482 F.2d at 365.

> We conclude that under the teachings of the *Parden* and *Employees* decisions before a State can be held to have implicitly waived its eleventh amendment defense, Congress must have expressly created a remedy in private parties for the violation of the applicable federal regulatory statute. To conclude otherwise would require a finding that the Bridges Act of 1906 created a private cause of action, a statutory interpretation clearly not mandated by its provisions. Further we would have to take an additional step into the murky waters of congressional intent by assuming since Congress "intended" that the appellee be a beneficiary of the substantive prohibitions of the Bridges Act of 1906, this intended remedy is also applicable against a sovereign State. Such "bootstrap logic" cannot withstand the constitutional shield erected by the eleventh amendment.... Against the unambiguous prohibitions of the eleventh amendment, we deem it constitutionally insufficient for a court merely to conclude that Congress by enacting a federal regulatory scheme *implied* that a state would be amenable to its provision in a suit by a private party. If Congress wishes a state to be amenable to a private suit then we think it up to that branch to

take the proper action necessary for such a result.

*Id.* at 366 n.14 (emphasis in original).

Contrary to the appellant's arguments, we find that the foundations of *Intracoastal* are still solid. If anything, the authorities in favor of what has come to be called the "clear statement" [1] approach with regard to eleventh amendment immunity have grown more numerous since our 1973 decision in *Intracoastal.* In the decade following *Parden,* the Supreme Court has taken several opportunities to affirm the clear statement approach. In 1973, the Court affirmed *Employees, supra,* the Eighth Circuit opinion that was the touchstone of *Intracoastal.* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). The Court reaffirmed that Congress had power to lift states' eleventh amendment immunity from suit in federal court but stated that Congress "would not be presumed to take such action silently." *Id.* at 285, 93 S.Ct. at 1618. Accordingly, Justice Douglas searched the legislative history of the Fair Labor Standards Act in vain for "a word ... to indicate a purpose of Congress to make it possible for a citizen ... to sue the state in federal courts" and concluded that Missouri was immune from a suit by state hospital and training school employees for compensation in federal court. *Id.* A year later, in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court concluded that state participation in a federal program could not in itself be taken to signify the state's consent to suit in federal court. Immunity under the eleventh amendment was upheld since "the threshold fact of congressional authorization to sue a class of defendants which literally includes States is wholly absent." *Id.* at 672, 94 S.Ct. at 1360.

The Supreme Court's most recent statements on the subject, *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), put its subsequent cases in context:

> In *Fitzpatrick v. Bitzer,* 427 U.S. 445 [, 96 S.Ct. 2666, 49 L.Ed.2d 614] (1976), the Court found present in Title VII of the Civil Rights Act of 1964, 42 U.S.C.

---

1. *See, e. g.,* Tribe, *American Constitutional Law* 140 (1978).

§ 2000e et seq., the "threshold fact of congressional authorization" to sue the State as employer, because the statute made explicit reference to the availability of a private action against state and local governments in the event the Equal Employment Opportunity Commission or the Attorney General failed to bring suit or effect a conciliation agreement. Finally, in *Hutto v. Finney,* 437 U.S. 678 [, 98 S.Ct. 2482, 57 L.Ed.2d 522] (1978), decided just last term, the Court held that in enacting the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988, Congress intended to override the eleventh amendment immunity of the States and authorize the awards payable by the States when their officials are sued in their official capacities. Although the statutory language in *Hutto* did not separately impose liability on States in so many words, the statute had "a history focusing directly on the question of State liability; Congress considered and firmly rejected the suggestion that States should be immune from fee awards." Also, the Court noted that the statute would have been rendered meaningless with respect to the States if the Act did not impose liability for attorneys' fees on the States.

*Id.* 99 S.Ct. at 1147 (citations and footnotes omitted). The Court went on to conclude that, since 42 U.S.C. § 1983

> does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of State liability and which shows that Congress considered and firmly decided to abrogate the eleventh amendment immunity of the States,

section 1983 did not abrogate the eleventh amendment immunity of the states. *Id.*

We need not here canvass in the abstract the difficult issue of just how express Congress must be before abrogation of eleventh amendment immunity is to be found.[2] Our conclusion, after review of the authorities since our decision in *Intracoastal,* is that the result and rationale of that case is in no way cast in question by later Supreme Court cases. We are therefore bound by our determination in that case that the Bridges Act of 1906 does not abrogate the state's eleventh amendment immunity. Moreover, *Intracoastal* had this to say about the Rivers and Harbors Appropriation Act of 1899:

> We are aware that some inroads have been made by this court in recognizing that a cause of action is vested in private parties by the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 401 *et seq.* In *Neches Canal Co. v. Miller & Vidor Lumber Co.,* 24 F.2d 763 (5th Cir. 1928), this court held that a private party could enjoin another private party who had violated 33 U.S.C. § 401 by building a dam over a navigable waterway without first obtaining the consent of Congress or the approval of the Army Corps of Engineers. However, considering the constitutional complexion of the present suit, we feel that the *Neches Canal* decision should properly be limited to the peculiar fact situation presented there.

> The suit in *Neches Canal* was between private parties. None of the defendants there could assert the defense of sovereign immunity granted by the eleventh amendment. There the obstruction, a dam, was placed in the navigable waterway without a license or a permit; thus the acts of the defendants clearly violated 33 U.S.C. § 401 .... However more importantly, the court in *Neches Canal* merely utilized the applicable standards enacted by Congress to determine whether a court could properly grant the equitable relief there prayed for. The court observed that the plaintiff was an "in-

---

**2.** *Cf. Peel v. Florida Department of Transportation,* 600 F.2d 1070 (5th Cir. 1979) (state employee's suit against State of Florida to enforce rights under the Veterans' Reemployment Rights Act not barred by the eleventh amend-ment). The "threshold fact of congressional authorization" was found, since the Act in this case expressly authorizes suit in federal district court. *Id.* at 1080.

tended beneficiary" of the congressional enactment and therefore the remedy provided by section 406, an injunction could be maintained by a private party. We receive many equitable considerations which influence the reasoning of the court that are not present here.

482 F.2d at 366 n.14.

The Rivers and Harbors Appropriation Act of 1899 does not evince an intent to visit liability on states. The Act requires a federal permit for bridge building and prohibits unauthorized obstruction of navigation. The Act's specific remedies for violation do not include a private action for damages. Section 406 provides that a violation of sections 401, 403, and 404 shall be a misdemeanor and, further, that an obstruction may be eliminated by injunctive proceedings brought under the direction of the Attorney General of the United States.[3] As the Third Circuit stated in *Red Star Towing & Transportation Co. v. Department of Transportation of New Jersey*, 423 F.2d 104, 105–06 (3d Cir. 1970):

> Congress in exercising this regulatory authority over navigation did not, as it had in the Federal Employers' Liability Act, create any civil cause of action in favor of private parties injured by any violation of the Act. Rather, it chose to achieve its regulatory purpose through specific penal sanctions.
>
> . . . . Congress must express an intent to override the State's immunity. In *Parden* the Supreme Court found such an intent in the creation by Congress of such a cause of action against the State. However, as has been pointed out, the presently relevant statute regulating the bridging of navigable streams does not confer any new civil remedy upon private parties and thus cannot by logical inference be read as intended to impose equivalent civil liability on an otherwise immune State.

(footnote omitted).

*Neches Canal* determined only that the Rivers and Harbors Appropriation Act of 1899 authorized a private party's prospective injunctive action in federal court. The heart of the eleventh amendment, however, is that the federal courts, absent voluntary waiver by states or congressionally extracted consent, are not the appropriate institution to impose monetary liability on states. *Edelman v. Jordan*, 415 U.S. at 664, 94 S.Ct. at 1356 (eleventh amendment is no bar to prospective injunctive relief by federal court). Appellant can point to nothing in the 1899 Act that authorizes a federal court to impose monetary damages on a state as opposed to mere injunctive relief. The 1899 Act cannot be read to abrogate Louisiana's eleventh amendment immunity, and we do not depart from dicta in *Intracoastal* to this effect.

■ The appellant further argues that Louisiana waived its eleventh amendment immunity by entering into a consent judgment with Sea-Land for damage suffered by the charterer in the March 5, 1973, accident. The short answer to this contention is that the attorney for the Department had no clearly expressed authority to waive eleventh amendment immunity. Indeed, Louisiana has clearly expressed its intention to preserve its immunity. La.Rev.Stat.Ann. Title 13 § 5106 (West Supp.1980), provides: "No suit against the state, state agency, or political subdivision shall be instituted in any court other than a Louisiana state court." We conclude that Louisiana did not waive its immunity for the reasons more elaborately stated in this court's recent opinions in *Dagnall v. Gegenheimer*, 631 F.2d 1195 (5th Cir. 1980), *aff'd on rehearing*, 645 F.2d 2 (5th Cir. 1981). *See also Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

### Denial of Judgment N.O.V. and Partial New Trial

■ Appellant contends that the trial court erred in denying his motion for judgment n.o.v. or, alternatively, for partial new

---

**3.** The statute has also been read, by implication, to permit the United States to remove an obstruction to navigation and then to sue the individual responsible for the costs of removal. *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967).

trial as to the liability of Sea-Land. In brief, counsel's argument is that Sea-Land violated its Jones Act duty to provide a safe place to work each time the MAYAGUEZ entered the Innerharbor Navigation Canal and by not rescinding Freimanis' standing orders to ready the gangway, thus allowing its seaman to be on a dangerous deck just after a collision.

We are precluded from considering the merits of appellant's motion for judgment n.o.v. because he failed to move for a directed verdict at the close of the evidence as required by Fed.R.Civ.P. 50(b). As we recently pointed out in *Quinn v. Southwest Wood Products, Inc.*, 597 F.2d 1018, 1024–25 (5th Cir.), *rehearing denied*, 603 F.2d 860 (1979):

> It is the law in this circuit, as generally elsewhere, that the sufficiency of the evidence supporting a jury verdict is not reviewable on appeal, nor may a motion for judgment n.o.v. be granted, unless a motion for directed verdict was made at the close of all the evidence by the party seeking that review. Speaking of this rule, we have noted:
>
> > The reasons behind the rule are sound. For example, a litigant may not gamble on a jury's verdict and then later question the sufficiency of evidence on appeal.... Similarly, the litigant who has not moved for a directed verdict in the trial court must have been of the view that the evidence made a case for the jury; he should not be permitted on appeal to impute error to the trial judge for sharing that view.
>
> A reason for the rule overlapping those given by us above as examples is to avoid making a trap of the motion for judgment notwithstanding the verdict, either at the trial stage or on appeal. When a claimed deficiency of the evidence is called to the attention of the trial judge

and of counsel before the jury has commenced deliberations, counsel still may do whatever can be done to amend his case. But if the court and counsel learn of such a claim for the first time after verdict, both are ambushed and nothing can be done except by way of a complete new trial. It is contrary to the spirit of our procedures to permit counsel to be sandbagged by such tactics or the trial court to be so put in error.

(citation omitted). Although, as *Quinn* itself demonstrates, this and other courts have taken a liberal view of what constitutes a motion for a directed verdict, a fair reading of the record fails to show any indication that the plaintiff moved for a directed verdict at any time prior to the jury's deliberations.[4]

As for the appellant's second contention, we find that the trial court's denial of the motion for a partial new trial was not an abuse of discretion. As we stated in *Conway v. Chemical Leamon Tank Lines, Inc.*, 610 F.2d 360, 362–63 (5th Cir. 1980):

> The general standard by which we review trial court orders granting new trials ... recognizes the deference that is due the trial court's first-hand experience of the witnesses, their demeanor, the context of the trial, and the like. This deference is especially appropriate where a new trial is denied and the jury's determinations are left undisturbed .... New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.

*See also, e. g., Cities Service Oil Co. v. Launey*, 403 F.2d 537, 539–40 (5th Cir. 1968). Here a jury found that of the two defendants in the suit, only the Department was negligent. There was sufficient evidence to support the jury's finding. It was not against the great weight of the evidence.

4. Before jury deliberations, the appellant formally objected to the trial court's failure to give certain enumerated charges. These charges would have redefined the jury's task but do not amount to a request for direction of a verdict. Thus, the "anomalous" situation existing in *Quinn*, where formal motions requesting a directed verdict and objecting to the submission of a special interrogatory on very specific grounds of evidentiary insufficiency made prior to jury deliberations sufficed to preserve for review the question of sufficiency of the evidence, did not exist here.

The mere fact that the MAYAGUEZ had experienced frequent difficulties in traversing the Danziger Bridge, including past collisions with the bridge's fender system, does not necessarily mean that Sea-Land was negligent in bringing the huge ship into the canal. The jury could well have concluded that the proximate cause of the accident here was that a bridge failed to open, not that the ship was too unmanageable to maneuver between bridges. Although there was testimony to the effect that once the MAYAGUEZ lined up with the bridges it was impossible for the vessel to stop short of the Danziger Bridge without at least endangering other vessels, it is not unusual for a vessel to become committed to a course through a drawbridge before the bridge opens. A vessel that has given a signal to the operator of a bridge to open the span can, in the absence of proper warning, prudently proceed and assume that the span will be timely opened for passage. The vessel is not bound to heave to until the bridge has been raised or to examine the situation critically before proceeding. *Hagan v. Department of Highways of Louisiana*, 368 F.Supp. 446 (M.D. La.1973), *aff'd*, 496 F.2d 1405 (5th Cir. 1974).[5] There was evidence here that the west span of the Danziger Bridge was raised to a degree only slightly less than vertical, making the bridge's condition unobservable until only a few seconds prior to the actual collision. Consequently, the jury, which was properly instructed as to the law under *Hagan*, could well have concluded that the MAYAGUEZ proceeded properly and had no sufficient warning of the bridge's condition prior to impact.

 The appellant also contends that Sea-Land did not provide Freimanis with a safe place to work. The argument is that the ship became unseaworthy after its collision and that Sea-Land had a duty to rescind its standing order to Freimanis to prepare the gangway. In failing to do this, Freimanis was, on this view, requiring a seaman to work directly under a damaged bridge wing. There is no dispute that Freimanis' duty station was on the bow of the vessel and that once the vessel cleared the Danziger Bridge his standing orders were to prepare the gangway for use. The controversy centers on whether there was sufficient time or opportunity for anyone to either direct Freimanis to ready the gangway or to rescind the standing order to rig the gangway after the vessel collided with the bridge but before debris from the damaged bridge wing began to fall.

The testimony of Freimanis at trial does not suggest that an appreciable period of time elapsed between the vessel's striking the bridge and the boatswain's injury by falling debris.[6] Certainly, Freimanis' testi-

---

5. A section of the International Waterways Act, 33 U.S.C. § 499, establishes a duty for operators of drawbridges to open them for vessels.

6. Freimanis testified at trial as follows:

Q After the bow passed through the bridge, what did you do?

A Well, that was standing orders, as soon as the bow was leaving the bridge, I started going back to get to the gangway and get it ready for lowering.

Q And, where were you when the wing struck the bridge?

A Well, I was just about up to it. I didn't think nothing was going to happen. The gangway had to be rigged and I just went and got that done.

. . . .

Q Had you started back toward the gangway before the collision took place? In other words, had you started to walk back toward the gangway before the wing of the vessel actually hit the highway bridge?

A As soon as the bow would get through there, I started walking back.

Q And, at that point in time the wing of the vessel had not yet hit the—

A Not when I started, no. But, I was on the way when it hit.

Q About how far were you from the area of the wing of the navigation bridge? How far away from that were you when the collision actually took place?

Q I walked almost as fast as the ship was moving. I guess past the bridge.

Q So, you were actually right underneath it?

A Yes.

Q So, in other words, when you got to the area where the pieces were falling down, they had not yet started to fall?

A They were falling. Something hit me on the back. I don't know what it was.

Q I realize that but my question was, before you got to the immediate area where the

mony is compatible with a jury's determination that he was either injured simultaneously with the vessel's striking the bridge or so shortly thereafter as to preclude the rescission of the standing order and that therefore Sea-Land was not negligent.[7] We therefore refuse to disturb the trial court's denial of the motion for a partial new trial.

### Jury Instructions

■ Finally, the appellant claims that the trial court improperly denied two jury charges drafted by appellant. His requested jury charge number 13 stated as follows:

A superior officer has a duty to specifically warn men under his control that he knows are working on a vessel in an area of possible danger that they should stay away from certain areas or situations, and the failure of such superior to either explain to his men or to warn them specifically of the danger is negligence attributable to the company.

The law is clear that a party is "not entitled to have the jury instructed in the particular language of its choice." *Frosty Land Foods International, Inc. v. Refrigerated Transport Co.*, 613 F.2d 1344, 1348 (5th Cir. 1980). The trial court has discretion as to the substance and form of jury charges as long as the jury is not misled and understands the issues. *Id.* The Second Circuit has recently outlined three examples of circumstances in which failure to submit the requested instructions is not reversible error:

First, if the requested instruction is given "in substance," there is no error. Second, even if the jury is only given a general instruction without being given the specific theory of the case, the refusal will not be reversible if the party's theory of the case was apparent throughout the course of the trial.... Finally, plaintiff has no right to the presentation of an instruction unsupported by the evidence adduced at trial.

*Beard v. Mitchell*, 604 F.2d 485, 497 (2d Cir. 1979) (citations omitted). We conclude that instruction number 13 was properly rejected by the trial court for either of the first two reasons elaborated by the Second Circuit in *Beard*.[8]

The trial court gave in substance the instruction requested. The judge instructed the jury as follows:

·An employer is liable for the negligent acts of its employees committed while in the course and scope of their employment. The burden is on the plaintiff to establish by a preponderance of the evidence in the case that the negligence of one or more employees or other agent of the defendants (other than the plaintiff himself) caused any injury and consequent damages sustained by him. The pilot of the S/S MAYAGUEZ was an agent of defendant Sea-Land Services,

---

pieces were falling off of the wing of the bridge, had they already started falling?

A No, not right then. But they did after she hit, after she bumped it.

Q So, if I understand you correctly, and please correct me if I am wrong, it was not until you were actually underneath that navigational wing?

A Right.

Q It was not until you were actually underneath there until the pieces started falling. They had not started falling until then?

A Right.

Q In other words, you did not realize, they were not falling down on the deck before you walked into the area, right?

A Right.

7. Appellant's argument based on unseaworthiness fares no better. As appellant himself admits in his brief, operational negligence upon a

vessel resulting in "instantaneous unseaworthiness" will not give rise to liability on the part of the owner. If the unseaworthy condition is created simultaneously with the injury, liability does not attach to the owner. *Usner v. Luckenbach*, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); *Robinson v. Showa Kainum K. K.*, 451 F.2d 688 (5th Cir. 1971). It was not against the great weight of the evidence for the jury to conclude that Freimanis' injury occurred simultaneously with the ship's collision.

8. We express no opinion as to whether the requested jury instruction was impermissible under *Beard*'s third circumstance, *i.e.*, whether there was insufficient admissible evidence to permit the appellant's jury instruction. Again, the question turns on whether or not there was time for a crew member to warn Freimanis.

**1164**

Inc., and it would be liable for any negligent act of his.

Although the appellant's suggested instruction might have been more favorable to his case, it is a fundamental rule that mere differences of form or emphasis in jury instructions do not constitute reversible error. *Fleming v. Michigan Mutual Liability Co.*, 363 F.2d 186 (5th Cir. 1966). Moreover, the appellant's theory of the case was apparent throughout the trial and in the appellant's closing argument. The jury could not have misunderstood either the law or the appellant's theory of negligence on the part of Sea-Land.

■ Appellant's requested charge number 24 stated:

> The shipowner contends, among other things, that even if its employees or agents were negligent, or its vessel was unseaworthy, that the plaintiff was himself negligent for attempting to do the work when he knew about the unsafe working condition. The maritime law, however, does not consider a seaman negligent at all when he has no choice but to follow instructions even though he knew or should have known about the unsafe working condition and the possibility of his getting hurt while trying to do the work.

It is not clear whether appellant in fact preserved his objection to the trial court's failure to give this instruction.[9] We fail to see in any case how the appellant was prejudiced by the court's refusal to submit the proposed charge to the jury. The court made it clear to the jury that "there was no contributory negligence on the part of the plaintiff," and the jury found none. The jury found that the Department was 100 percent at fault.

The appellant has therefore failed to demonstrate any error in the trial court's disposition of this case. The Department's motion to dismiss was properly granted, and appellant's motion for a partial new trial and request for specific jury instructions were properly denied.

AFFIRMED.

9. Counsel for Freimanis originally objected to the court's failure to charge the jury with its requested charge number 24. However, in explaining his reasons for other objections, counsel arguably dropped this objection when he stated to the trial court: "Number 24, we really need not go into this since contributory negligence was not an issue in this case."