The **MERCHANTS NATIONAL BANK OF MOBILE, Plaintiff–Counter Defendant, Appellant,**

v.

**UNITED STATES** of America, Defendant–Counter Plaintiff, Appellee.

No. 88–7277.

United States Court of Appeals, Eleventh Circuit.

Aug. 4, 1989.

---

2. In the alternative, the magistrate recommended that respondent's motion for summary judgment be granted.

I. David Cherniak, Alan C. Christian, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, Ala., for plaintiff-counter defendant, appellant.

Gary R. Allen, Chief, William S. Rose, Jr., Asst. Atty. Gen., Richard Farber, Janet K. Jones, U.S. Dept. of Justice, Tax Div., Washington, D.C., Edward J. Vulevich, Jr., Asst. U.S. Atty., Mobile, Ala., for defendant-counter plaintiff, appellee.

Before HILL and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from a judgment after a jury trial in which the jury found in favor of the United States following an assessment of the so-called 100 percent penalty pursuant to Section 6672 of the Internal Revenue Code of 1954 (26 U.S.C. § 6672).

## I. STATEMENT OF THE CASE

The penalty was assessed against Merchants National Bank of Mobile (Bank) for its failure to collect and pay over the taxes withheld from the wages of employees of Maritime Coatings, Inc. (Maritime) during the first, second and third quarters of 1979. The Bank paid a portion of the assessment which permitted it then to file suit for a refund of the amount paid and an abatement of the remainder of the assessment made by the United States. The government counterclaimed for the balance of the assessment. The case was submitted to a jury which, by a special verdict,[1] found for the government and the trial court entered a final judgment against the Bank in the sum of $241,421.71. After denying a motion for judgment notwithstanding the verdict. This motion was denied by the district court. Thereupon this appeal followed.

## II. STATEMENT OF THE FACTS

Since the determination by the jury that the Bank was a "responsible" party under Section 6672 is based upon the entire relationship between the Bank and Maritime, this is necessarily a fact specific case. The facts must therefore be considered in detail.

Oral testimony and records of the parties showed the following facts which could properly be considered by the jury:

Maritime was a marine sand blasting and painting company located in Mobile, Alabama. Early during its operations, it employed some two to three hundred people and had a quarterly payroll of more than $1,000,000. At all times relevant to the appeal, the company's president and princi-

---

1. The jury's special verdict found that for each of the three quarters involved, the first, second and third quarters of 1979, the Bank was responsible for collecting or accounting for or paying over Maritime's withholding taxes for the first quarter of 1979. It also found that the Bank willfully failed to collect or truthfully account for or pay over the trust fund taxes for the three quarters.

pal stockholder was Richard Trum. At all times, the Bank was involved in lending Maritime substantial sums of money. Mr. Dowdell, the Bank's vice-president, who was responsible for the account of Maritime, testified that, at some time in February of 1979, he noticed that the company's financial situation had "deteriorated somewhat." He then said, concerning the existing relationship, the following:

> Well, at the time, the relationship had strictly been on a basis of the customer bringing in an invoice and assigning that invoice as collateral to a particular loan under their line, with really no basic rules and regulations concerning the lending relationship which, in banking, as you know, is called a loan agreement and, at the time, I felt that the company needed to be under more rules and regulations concerning their lending ability— their bonding borrowing ability with us, to attempt to try to get the company back in a more comfortable position.

Thereupon Maritime and the Bank entered into what was denominated a "loan agreement."

For the fiscal year ending September 30, 1978 preceding the execution of the loan agreement, Maritime showed a net loss of approximately $446,000 and showed a negative net worth exceeding $200,000. By the end of the calendar year 1978, Maritime's indebtedness to the Bank totaled approximately $600,000. However, during its entire period of operations prior to 1979, Maritime had timely paid the full amount of its federal withholding taxes.

The agreement conditioned future loans upon the Bank's prior approval of collateral offered by Maritime. The agreement was secured by the requirement that Maritime pledge all of its accounts receivable or "payables" to secure the indebtedness, which was also secured by a lien against physical assets. The agreement also required Maritime to pay over immediately to the Bank any payment which it received from a pledged account receivable. These payments were to be deposited in a "collateral account" and would then be used to reduce Maritime's debt to the Bank. The

agreement was also personally guaranteed by Trum, the president of the company.

The agreement between the Bank and Maritime provided for the Bank's prior approval before Maritime could enter any new contract. It also restricted Maritime's power to make any new lease or make any leasehold improvement, without first obtaining the Bank's approval. The agreement also limited the amount of salaries of officers and employees and it required that Maritime should provide the Bank with detailed financial information, listings of accounts payable and original copies of any contracts which it might execute. It prohibited Maritime from paying dividends, purchasing or retiring outstanding stock, borrowing money from any lender other than the Bank or expending more than $25,000 in equipment purchases or capital expansion without first securing the Bank's approval. In order to maintain complete control over funds received from the payment of receivables, the agreement required the opening in the Bank of a "collateral account" in which Maritime was required to deposit any amounts collected from receivables "immediately upon receipt." The Bank had exclusive control over this account. No officer or other person with Maritime could withdraw any such funds. Maritime continued to maintain its general account which was replenished from time to time by advances from the collateral account upon the consent of the Bank. Thereafter, continuing the practice that was already in existence, Maritime was frequently overdrawn in its general account.

Following the signing of this agreement, the expenses of the company for such personal expenditures on behalf of the officers as automobile rents, club dues, and the like, were less than they had previously been because, as testified to by a bank officer, "the Bank had placed restrictions on those categories of expenses."

Maritime continued to have a general account at the Bank on which the company drew checks to pay operating expenses, including employees' wages. The Bank had no authority to write checks against

Maritime's general account. Maritime submitted to the Bank weekly requests, identifying the individual payee and the amounts needed. These weekly requests for transfers from the collateral to the general account included specified amounts for Maritime's weekly payroll deposits. Trum testified that in addition to submitting a weekly list of payables, the company bookkeeper "would contact the Bank ... on Tuesday so [that the Bank] could write the checks on Friday." During the same period, Maritime also submitted weekly lists of its accounts receivable. During April, May and June, 1979, the Bank transferred funds from the collateral account to Maritime's general account in its sole discretion. The Bank had the option at any time of applying these funds towards Maritime's indebtedness rather than transferring the money to the company's general account. There was testimony to the effect that during the time the collateral account was in effect, it was the only source of funds for Maritime's general account. This testimony was given by a Bank official in response to a question by counsel for the Bank on cross-examination. This question was as follows:

> So, what you are telling me is—what your knowledge indicates to you is that during the period of time that the collateral account was in effect that that was the only source of funds of deposits into the general account; is that correct?
> Answer: Yes, sir. Some $1,700,000.

The same witness testified that from April 18, 1979, it "began typically being overdrawn" and that the overdraft "continued all the way through May and through June and on into July, through all of July and on through and into August."[2]

The overdrafts were twice reduced by the signing by Maritime of two promissory notes in the total amount of $211,000 to cover a part of the overdrafts. During this period of time, according to Dowdell's testimony, he "talked to Mrs. Vogwill (Maritime's bookkeeper) probably at least every day and sometimes twice" regarding the overdrafts in the general account. In late April, Maritime requested the Bank to release approximately $270,000 from the collateral account. However, Dowdell would not do this without first requiring Maritime to sign a letter. This letter was signed on April 25, 1979 and stated that the funds were necessary for Maritime to continue operating and it concluded with the statement that: "All payroll tax deposits required by state and federal governments have been made." However, at the time of this letter, Maritime had made only two weekly tax withholding payments for the first quarter and at that time owed the federal government approximately $240,-000 for its first quarter liability.

Trum later testified that he had frequently "discussed this tax thing with Mr. Dowdell" before he executed the April 25, 1979 letter and that the two had agreed that Maritime should "pay the people on the job who were generating the funds" and pay the withholding taxes later when Maritime received a progress payment from one of its accounts. In his testimony, however, Mr. Dowdell stated that he relied on the letter's representation that Maritime had paid its taxes and he did not know the true facts until late in June.

Two days later, Maritime presented for payment, $248,000 in checks payable to the Internal Revenue Service bearing dates ranging from January 19, 1979 through March 31, 1979. These checks represented most of Maritime's first quarter tax liability. Dowdell later testified that he did not

---

**2.** This testimony given by Fred Taul, an officer of the Bank, was as follows:

A. The account, on April 18th, began typically being overdrawn, rather than having a positive balance as we have seen earlier. The first overdraft occurring on April 18th in the amount of ten thousand nine hundred and fifty-eight dollars and ninety-eight cents.

Q. Now, did that overdraft, in amounts declining and increasing in rough amounts, con-

tinue through the end of May to the end of June, which we have already discussed, a hundred and fifty dollars in overdrafts, at that time?

A. Yes, sir. It continued all the way through May and through June and on into July, through all of July and on through and into August.

know that the company had presented for payment checks totaling $248,000 within a day or so after the transfer of funds to Maritime's general account.

In the second quarter of 1979, Maritime made only two payments of federal withholding taxes, one dated April 27 for $19,186.06 and the other dated May 4, 1979 for $16,865.19. Although Maritime's general account was overdrawn, the checks were both honored. Mrs. Vogwill testified at trial that after these checks were presented, Dowdell instructed her to inform Trum "not to release any more of the payroll tax deposit checks unless there was money in the regular account to cover them." The Bank continued to honor other checks for payroll and other corporate purposes even though they increased the company's overdraft at the Bank. Trum made out the checks for the federal withholding tax and kept them in his desk drawer instead of sending them on to the government for the remaining unpaid weeks of the first quarter.

Referring again to the time that the Bank first knew of the non-payment of the first quarter's federal withholding taxes, Mrs. Vogwill testified as follows:

A. It was a meeting with the stockholders and the lawyers—Jimmy Dowdell and it was mentioned that the payroll taxes had not been paid and the Bank didn't know this and I looked at Jimmy Dowdell. I said, "Jimmy, you knew those payroll taxes hadn't been paid."

Q. What did Mr. Dowdell tell you?

A. He did not say anything then and he called me later in the week and I asked him why he had said that. He said, "I knew they hadn't been paid but I didn't realize how great they were."

. . . .

Q. Would that have been a meeting on or about June 27, 1979?

A. Could have been. I am not sure of the date.

Thereafter, Maritime was unable to collect anything like the full amount it had claimed was due from two of its principal customers, and shortly thereafter, it sought protection in the bankruptcy court under Title XI.

## III. DISCUSSION

### A. *The Statutory Framework*

As stated by appellant's brief, Section 6672 provides for a penalty equal to the sum of an employer's unpaid withholding taxes against any person "responsible" for payment of same and who "willfully" fails to do so. Pursuant to § 6671(a), the so-called "responsible" person penalty of § 6672 is to be assessed and collected in the same manner as taxes. Thus, in order to assess the § 6672 penalty against MNB, the Government had to administratively find that MNB was a "responsible" person required to truthfully account for, collect and pay over the unpaid withholding taxes of Maritime, and "willfully" failed to do so.

The courts have embraced a broad and functional test to determine liability under § 6672 and who qualifies as such a "responsible" person. As the Fifth Circuit noted in *Commonwealth v. National Bank of Dallas v. United States*, 665 F.2d 743 (5th Cir.1982):

... [T]he test of liability under § 6672 is indeed a functional one: so long as a person has ultimate authority over expenditures of corporate funds and effective power to see to it that federal employment taxes withheld by an employer are paid, he or she qualifies as a responsible person.

665 F.2d at 752. Thus, § 6672 can be applied to banks or other lenders, though as also noted by the Fifth Circuit in *Commonwealth:*

... the facts in *Hill* [an earlier case] are critical (as indeed they are in any § 6672 case), and we set forth those facts at some length so that we will be in a position to compare those facts with the facts in this case....

*Id.* at 752–53.

It is conceded by the appellant that Section 6672 can be applied to banks or other lenders as well as officers, directors or other employees of the employer corpora-

tion. [App. Br. p. 27]. It is also true as stated by appellant that: "The facts ... are critical" in any determination as to whether a particular person or corporation is a responsible person under § 6672.

### B. *The Bank as Responsible Person*

Facts which have been found to be insufficient to constitute a lender a responsible person are set out in *United States v. Hill,* 368 F.2d 617 (5th Cir.1966). Facts, on the other hand, from which a jury was permitted to find that a lender was a responsible person are set out in *Commonwealth National Bank of Dallas v. United States, supra.* We recognize, of course, that the decision in *Hill* is binding on this Court to the extent that the facts are the same.[3] However, we are constrained to pay careful attention to the *Commonwealth* case which, although not binding on this Court, because it was decided subsequent to October 1, 1981, interprets a prior decision of the same Court.

■ A careful reading of *Hill* and *Commonwealth* convinces us of the correctness of the following analysis by the Court in *Commonwealth:*[4]

> We read *Hill* as holding that, in a situation in which there are funds available to a corporate employer for the payment of withheld federal employment taxes *that are not advanced by a lending bank directly (as loans or overdrafts) or indirectly (as progress payments assigned to the bank which the bank permits the company to retain),* the decision of the bank not to permit its direct and indirect advances to be used for the payment of such taxes, and the concomitant use of a veto power over corporate checks, funded through such advances, to insure their use in accordance with the terms of the advances, will not, without more, subject the bank or its lending officer to § 6672 liability. The court, citing the government's brief, specifically noted that the bank was not in control of the company's checking account and that the bank's refusal to make a loan for the payment of employment taxes had not had the effect of altering the control of Messrs. Hill and Moore of the company.

We cannot interpret *Hill,* as Commonwealth and Pittman urge us to do, as precluding § 6672 liability under all circumstances for a lending bank or its officer. The *Hill* court began by setting forth the broad language in [*United States v.*] *Graham* [309 F.2d 210 (9th Cir.1962)] to the effect that § 6671(b) must be construed to include all those *so connected with* a corporation as to be responsible for the performance of the act in respect of which the violation occurred. The court went on to make a careful distinction between the control which the bank and Jeffus exercised only over the bank's advances and the control which the management of the company continued to exercise over the company's checking account (containing advances from the bank *and funds from other sources as well* ) *and its business generally.* These aspects of the court's opinion in *Hill* suggest to us that in a situation in which a *lending bank and an officer thereof have the power to see to it that the borrower's taxes are paid, to make final decisions concerning the disbursement of the funds of the borrower or to determine which creditors are to be paid and when,* the *Hill* court would not hesitate to affirm a judgment holding the bank and its officer liable under § 6672....

665 F.2d at 754–55 (emphasis in original in part and added in part).

In *Hill,* there were ample funds in the Hill and Moore general account from sources other than bank advances with which the company could have paid the withheld taxes. In this case, testimony of the Bank official himself was that the collateral account [over which the employer

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.

**4.** In this quote, Pittman and Jeffus were officers of the bank and Hill and Moore were officers of the borrowing company, the employer. CPF was the corporate employer.

had no control] was in effect "... the only source of funds of deposits into the general account." Thus, it is clear that it was only by the payments by the Bank of its own volition from the collateral account into the general account, or the allowance by the Bank of additional overdrafts that the withheld taxes could have been paid to the Internal Revenue Service.

■ In view of the almost complete control held by the Bank over the operation of Maritime during its last three quarters of operation, and the fact that the checks drawn by Maritime for the payment of withheld taxes were kept in the desk drawer of the president of Maritime on instructions from the Bank not to present them for payment unless funds were available we find the factual situation that was presented to the jury here is directly in line with that which existed in *Commonwealth.*

We especially note the following language from the *Commonwealth* opinion:

The image that emerges from the foregoing facts, and a conclusion that the jury could clearly have reached, is that of a company wholly dependent for the payment of any bills whatsoever on what Commonwealth's and Pittman's own brief describes as selective extensions of credit. Unlike *Hill,* where the construction company *had unencumbered funds* and control over its own bank account, CPF *had no unencumbered funds* and any control which it had over its bank account was, at best, shared with Pittman....

665 F.2d at 757 (emphasis added).

The facts here are almost identical with those in *Commonwealth.* Under the loan agreement, the Bank had the right to oversee substantially all of the significant operations of Maritime. Moreover, it actually exercised this authority by selectively authorizing the honoring of checks and selectively declining to honor others. Those which it decided not to honor were the checks drawn by Maritime in payment of the withheld taxes. As to these alone, the Bank refused to permit an additional overdraft on the general fund. Therefore, not inconsistent with *Hill* and fully consistent

with *Commonwealth,* we conclude that the trial court properly submitted to the jury the issue of whether the Bank was a responsible person.

### C. *Charges to the Jury*

■ Appellant contends that the trial court erred in five charges which it had requested the court to give to the jury. This Court has stated the standard by which such contention is measured in *Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 750 F.2d 1516 (11th Cir.1985). There, the Court said:

... The purpose of jury instructions "is to give the jury a clear and concise statement of the law applicable to the facts of the case." *Hanover Fire Ins. Co. v. Sides,* 320 F.2d 437, 444 (5th Cir. 1963)....

In reviewing the district court's jury instructions, this court will look to see whether the charges, considered as a whole, sufficiently instruct the jury so that the jurors understand the issues involved and are not misled. *Frosty Land Foods International, Inc. v. Refrigerated Transport Co.,* 613 F.2d 1344, 1348 (5th Cir.1980); *see Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1372 (5th Cir.1981); *see also Somer v. Johnson,* 704 F.2d 1473, 1477–78 (11th Cir. 1983) (to determine prejudicial effect, charge must be viewed in its entirety); *Johnson v. Bryant,* 671 F.2d 1276, 1280 (11th Cir.1982) ("When the instructions, taken together, properly express the law applicable to the case, there is no error...."). Moreover, the trial court's refusal to give a requested instruction is not error where the substance of that proposed instruction was covered by another instruction which was given. *See Freimanis v. Sea–Land Service, Inc.,* 654 F.2d 1155, 1163–64 (5th Cir. Unit A 1981); *see also Southern Railway Co. v. Haynes,* 293 F.2d 291, 294 (5th Cir.1961). If a requested instruction is refused and is not adequately covered by another instruction, the court will first inquire as to whether the requested instruction is a correct statement of the law. See e.g., *Bueno v. City of Donna,* 714 F.2d 484, 490 (5th Cir.1983). If the instruction is a

correct statement of the law, the court will next look to see whether it deals with an issue which is properly before the jury. See e.g., *Collins v. Metropolitan Life Insurance Co.*, 729 F.2d 1402, 1405 (11th Cir.1984). In the event both these standards are met, there still must be a showing of prejudicial harm as a result of the instruction not being given before the judgment will be disturbed. *See Hunt v. Liberty Lobby*, 720 F.2d 631, 647 (11th Cir.1983); *Somer*, 704 F.2d at 1477–78; *Miller*, 650 F.2d at 1372 (5th Cir.1981).

*Id.* at 1525.

We have reviewed the separate requested charges (except requested charge no. 8, to the refusal of which no objection was taken) and find that the substance of those that were appropriate was adequately covered by the instructions which were given by the court and, as stated in *Pesaplastic*, *supra*, "utilizing the aforementioned analysis, we conclude that the district court's instructions to the jury, when viewed in their entirety, constitute a clear, concise and accurate statement of the law," *id.* at 1515.

Appellant, therefore, clearly is not entitled to a new trial based on this contention.

## IV. CONCLUSION

The judgment of the trial court is AFFIRMED.