Jean E. WELCH, Plaintiff-Appellant,

v.

STATE DEPARTMENT OF HIGHWAYS AND PUBLIC TRANSPORTATION and the State of Texas, Defendants-Appellees,

Drott Manufacturing Company and J.I. Case Co., Defendants.

No. 83–2253.

United States Court of Appeals, Fifth Circuit.

Jan. 22, 1986.

---

Patrick E. Higginbotham, Circuit Judge, specially concurred and filed an opinion in which Garwood and Robert Madden Hill, Circuit Judges, joined.

Brown, Senior Circuit Judge, dissented and filed an opinion in which Alvin B. Rubin, Reavley, Politz, Tate, Jr., and Johnson, Circuit Judges, joined.

Michael D. Cucullu, Houston, for plaintiff-appellant.

Joe Jerrard, Dudley Fowler, Austin, Tex., David Allan Smith, Richard D. Naylor, Asst. Attys. Gen., F. Scott McCown, Austin, Tex., for State Dept. of Highways and State of Tex.

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS and HILL, Circuit Judges.*

---

* Judge Edith H. Jones was not a member of the court when this issue was submitted to the court en banc and did not participate in this decision.

## OPINION

JERRE S. WILLIAMS, Circuit Judge:

Appellant Jean Welch was injured while working as a marine technician on the ferry landing dock at Galveston, Texas. Claiming under the Jones Act, 46 U.S.C. § 688, she sued her employer, the Texas Highway Department, and the State of Texas, for her injuries. In addition she also sued the manufacturer of the mobile crane which she alleges contributed to her injury.[1] Her Jones Act claim was dismissed by the district court on the assertion of sovereign immunity by the State of Texas and the Texas Highway Department, 533 F.Supp. 403 (S.D.Tex.1982). A panel of this Court by a split decision reversed the decision of the district court, *Jean E. Welch v. State Dept. of Highways and Public Transportation and the State of Texas, Drott Mfg. Co. and J.I. Case Co.,* 739 F.2d 1034 (5th Cir.1984). Rehearing en banc was granted, 739 F.2d at 1046.

### I.

The Highway Department of the State of Texas operates on a twenty-four hour basis a free automobile and passenger ferry between Point Bolivar and Galveston, Texas, across the waters which constitute the entrance to the Harbor of Houston, the third busiest port in the United States. The length of the ferry boat journey is approximately three miles from dock to dock. Without the ferry boat, a person wishing to travel from one area to the other by highway would have to drive approximately 130 miles. Appellant Welch was an employee of the Highway Department in the operation of the ferry. Her status as a "seaman" under the Jones Act is assumed and is not at issue. The State Highway Department was an insurer under the Texas Workers' Compensation Law, Texas Rev. Civ.Stat.Ann. art. 8306 et seq. (Vernon). Appellant, having been injured in the

---

1. Appellant's claim against the mobile crane manufacturer is not before us on this appeal.

course of employment, clearly was entitled to compensation benefits under that law. She sued instead in federal court under the Jones Act for the full measure of damages to which injured seamen are entitled if they can prove negligence of their employer which caused the injury.

## II.

The defense of the State, upon which it prevailed in the district court, is the defense of sovereign immunity under the Eleventh Amendment to the United States Constitution. While the Eleventh Amendment in terms only bars federal court jurisdiction in a suit by a citizen of one state against another state, the background under which the Amendment was adopted establishes a far broader foundation for the claim of sovereign immunity by the several states. It was assumed by the framers of the Constitution that the states could claim sovereign immunity not only in their own courts but in the federal courts. But in 1793, the United States Supreme Court held in *Chisholm v. Georgia*, 2 Dall. 419, 1 L.Ed. 440, that the jurisdiction of the federal courts extended to a suit by the citizen of one state against another state as against a claim of sovereign immunity by the state. At the next meeting of Congress following this decision the Eleventh Amendment was proposed, and it was quickly ratified.

While this is the only reference to sovereign immunity in the United States Constitution, it is established without question that the amendment simply broadened the sovereign immunity which already existed in the states as to their own courts. *United States v. Lee*, 16 Otto 196, 207, 106 U.S. 196, 207, 1 S.Ct. 240, 249, 27 L.Ed. 171 (1882); *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

## III.

The question raised by Welch bringing her Jones Act suit against her employer, the State of Texas, in federal court has been the subject of considerable doubt and confusion in the law. The starting point for the modern development of the law is *Parden v. Terminal R.R. Co.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), in which the Supreme Court found a forced implied state waiver of sovereign immunity in Federal Employer's Liability Act claims. 45 U.S.C. §§ 51–60. The Court took the position that the state by operating for profit an interstate railroad as a common carrier, a federally regulated business, automatically waived its sovereign immunity. It is also clear that in terms the Jones Act remedies are based upon the Federal Employer's Liability Act. 46 U.S.C. § 688.

Of relevance also to the origins of the modern law of waiver of sovereign immunity by the states when the federal government is acting in the field of its plenary powers is a case which antedated the *Parden* case, *Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959). The Court held that the Jones Act applied to maritime employees of the bi-state commission. The Court then went on to hold that the agreement of the states of Tennessee and Missouri to set up the interstate bridge commission by means of an interstate compact, which commission was given the authority to "sue-and-be-sued", constituted a waiver of sovereign immunity by the states to a Jones Act suit against the commission. For later developments in the law, as set out below, it is important to emphasize that in *Petty* the interstate compact under the Constitution had to be and was approved by the Congress. Congress had in terms, therefore, accepted the sue-and-be-sued clause as it related to the commission.

If the *Parden* case were to stand unlimited, it would dictate a reversal of the district court decision in this case and authorize Welch to bring her Jones Act suit in federal court. But the broad sweep of the *Parden* decision, although it has not been overruled, has overtly been limited by later decisions as its full implications have surfaced. *Employees of the Dept. of Public Health & Welfare v. Missouri Dept. of*

*Public Health & Welfare,* 411 U.S. 279, 286, 93 S.Ct. 1614, 1618, 36 L.Ed.2d 251 (1973), has regularly been cited by the Supreme Court following a citation of the *Parden* case because in the *Missouri Public Health & Welfare* case the Supreme Court modified *Parden* by holding that Congress must express itself in "clear language" to cause a private federal remedy for employees to be applicable to state employees.

A second case regularly cited by the Supreme Court is *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), which relied upon the *Missouri Public Health & Welfare* case to find a lack of waiver by the state of its sovereign immunity as to citizen suits against the state under the Federal Aid to the Aged, Blind, or Disabled Program under the Social Security Act, 42 U.S.C. §§ 1381–1385. *See* Note, Reconciling Federalism and Individual Rights: The Burger Court's Treatment of Eleventh and Fourteenth Amendments, 68 Va.L.Rev. 865, 871 (1982).

On March 4, 1985, the Supreme Court in *County of Oneida, New York v. Oneida Indian Nation of New York State,* —— U.S. ——, 105 S.Ct. 1245, 84 L.Ed.2d 169, cited *Parden, Missouri Public Health & Welfare,* and *Edelman* as establishing the Supreme Court's approach to congressional action forcing the states to yield their sovereign immunity otherwise existing under the Eleventh Amendment. The Court explicitly recognized that these cases involved "waiver [of sovereign immunity] for purposes of suit under a federal statute".

We relied upon the *Missouri Public Health & Welfare* case in *Intracoastal Transportation, Inc. v. Decatur County, Georgia,* 482 F.2d 361 (5th Cir.1973), in finding the state had not impliedly waived its immunity against claims brought under the Bridge Act of 1906 simply by operating in a federally regulated sphere. "The private litigant must show that Congress *expressly* provided that the private remedy is applicable to the states." 482 F.2d at 365 (emphasis added). Again, in *Freimanis v. Sea-Land Service, Inc.,* 654 F.2d 1155,

1160 (5th Cir.1981), we confirmed our decision in *Intracoastal* to find no forced implied waiver by the state in a private employee suit brought under the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401.

If there had been any doubt that we have correctly viewed the later Supreme Court cases as limiting the *Parden* case, that doubt was effectively and completely removed by the decision of the United States Supreme Court in *Atascadero State Hospital & California Dept. of Mental Health v. Douglas James Scanlon,* —— U.S. ——, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), decided June 28th of this past year. The case involved suits by private litigants seeking monetary relief under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The state agencies moved for dismissal of the complaints on the ground the Eleventh Amendment barred the federal courts from entertaining respondents' claims. The claim of sovereign immunity was accepted by the holding of the United States Supreme Court. The Court stressed that in its opinion in *Edelman v. Jordan,* it had said that the state will be deemed to have waived its immunity "only where stated 'by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction'", 415 U.S. at 673, 94 S.Ct. at 1361, quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909). The Court further said that even in the case of Fourteenth Amendment claims against the states, the Supreme Court in *Pennhurst v. State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), required "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several states'", quoting *Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979), and citing the *Missouri Public Health & Welfare* case.

The Court went on to state its own ruling in language even more specific. Justice Powell in his opinion for the Court said:

"Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear *in the language of the statute.* The fundamental nature of the interests implicated by the Eleventh Amendment dictates this conclusion." 105 S.Ct. at 3147 (emphasis added). The Court then restated and explained this requirement by stressing that Congress' power to abrogate a state's immunity means that in those circumstances the usual constitutional balance between the state and federal government does not obtain and that it is therefore "incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment." Justice Powell then stated categorically: "The requirement that Congress unequivocally express its intention in the statutory language ensures such certainty." 105 S.Ct. at 3148. Even more strongly in the next paragraphs the Court said "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language *in the statute itself.*" 105 S.Ct. at 3148 (emphasis added). Finally it should be noted that the opinion does not ignore the earlier *Parden* decision. It is cited along with the other later cases in a footnote appended to this final quotation from the opinion of the Court.

It would be difficult to make a legal principle more definitive than did Justice Powell writing for the Court in the *Atascadero* case. Congress can force the states to yield their sovereign immunity under the Eleventh Amendment only when it so states in clear language *within the statute itself.*

The other side of this constitutional principle was also set out by the Supreme Court in a decision on February 19th of this past year. The case is *Garcia v. San Antonio Metropolitan Transit Authority,* — U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). That case held that the employees of the San Antonio Metropolitan Transit Authority were covered by and entitled to the protections of the minimum wage and overtime provisions of the Fair Labor Standards Act, and they could enforce their claims by suits brought by these governmental employees in federal and state courts. This holding was pursuant to a 1974 amendment to the FLSA under which Congress had in terms within the language of the statute itself extended its coverage to virtually all public employees of the states and their governmental entities. 29 U.S.C. § 203(e)(2)(C), (s)(6), and (x). So in the space of four months we have one decision of the Supreme Court upholding the power of Congress to abrogate state sovereignty with unequivocal language contained in the statute itself and another decision holding that state sovereignty under the Eleventh Amendment remains intact in the absence of unequivocal language contained within the relevant statute itself. The Court has established a bright line rule.[2]

This summary of the law conclusively establishes that Welch did not have the power to bring a Jones Act suit against the State of Texas in the federal court absent an express waiver of sovereign immunity by the State of Texas. Such a suit is barred by the Eleventh Amendment in the absence of specific congressional language

---

**2.** A current analysis by Professor Martha Field of the Harvard Law School is in full agreement. In a comprehensive article entitled *Garcia v. San Antonio Metropolitan Transit Authority: The Demise of a Misguided Doctrine,* 99 Harv.L. Rev. 84–118 (Nov.1985), Professor Field evaluates the impact of *Atascadero* in these words:

The Court last Term, for example, four months after the *Garcia* decision, ruled in *Atascadero State Hospital v. Scanlon* that Congress would not be deemed to have exercised its power to require states to defend in federal court against individuals' claims that the

states are violating federal enactments, unless Congress has so stated in absolutely explicit language in the enactment itself. Because the Court imposed that condition retrospectively, it effectively placed upon Congress the burden of reenacting statutes regulating states if it would have states answer in federal court to individuals' suits.

In a footnote following this textual statement, Professor Field points out that in the analogous situation Congress did reenact the Fair Labor Standards Act to make it applicable to state employees.

contained within the statute itself requiring the abrogation of sovereign immunity. We should also emphasize that, as it is not now before us, we pretermit consideration of the question whether a state maritime employee can pursue a Jones Act claim in state court as against a state sovereign immunity assertion. In doing so we follow the pattern of the Supreme Court holdings in the cases establishing the law with respect to federal court suits. The Supreme Court also has not dealt with this issue.

## IV.

Appellant urges that there has been an express waiver by the State of Texas of its sovereign immunity under the Texas Tort Claims Act. The Act does waive immunity to suit against the state for personal injuries proximately caused by the negligence of state employees acting within the scope of employment if the injury arises from "the operation or use of a motor driven vehicle and motor driven equipment." Texas Rev.Civ.Stat.Ann. art. 6252–19 § 3 (Vernon Supp. 1980–81). Appellant's injury did arise from the use of motor driven equipment by a state employee. Section 19 of the Act, however, limits this waiver of immunity. It provides that a governmental unit carrying Texas Workers' Compensation Insurance is entitled to the "privileges and immunities" granted by the Workers' Compensation Act "to private persons and corporations". The claim is made that since the State of Texas admittedly cannot insulate private employers from Jones Act and maritime remedies, *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), granting the state agency "all of the privileges and immunities" constitutes an express waiver of sovereign immunity by the state under the Texas Workers' Compensation statute.

The short answer to this assertion is that it requires a tortured interpretation of the phrase "privileges and immunities" to find that those words constitute a waiver of the right of the state to limit suits by injured state employees in federal court. Instead, the obvious purpose of the statutory provision is to give to state agencies adopting Texas Workers' Compensation the protections against suits by injured employees for recovery of damages based upon negligence. If Texas had intended to withdraw its desire for coverage under the Texas Workers' Compensation Act by withdrawing the immunity in Jones Act cases, the granting of the "privileges and immunities" of the state Act was an exceedingly strange way to do it, and a much clearer way could have been found in simple language.

Of controlling importance in this case is recognition of the fact that once it is determined that Congress has not required the state to waive its sovereign immunity by unequivocal language in the statute, the question of whether the state has or has not waived immunity from suits in the federal court is a matter of state law. If the state has spoken in interpreting its law, it is not within our authority to reinterpret the law. *See Petty v. Tennessee-Missouri Bridge Comm.,* 359 U.S. 275, 278, 79 S.Ct. 785, 788, *supra.* We have the authoritative state interpretation of these very provisions. In *Lyons v. Texas A & M University,* 545 S.W.2d 56 (Tex.Civ.App. 1976), the precise issue of the case before us was decided by the Texas court. The case involved the injury of a seaman on a vessel owned and operated by Texas A & M University, a governmental unit of Texas. The Texas Workers' Compensation Act had been adopted by the University and was applicable to the injury. Lyons, however, brought suit to recover damages for unseaworthiness, maintenance and cure, and negligence under the Jones Act. The Texas Court of Civil Appeals affirmed the state district court in dismissing the claim. It found that section 19 of the Texas Tort Claims Act was intended to make the workers' compensation remedy exclusive. The Supreme Court of Texas denied review, finding no reversible error. Tex. Writs of Error Table, 134 (1982).

It is also noteworthy that the *Lyons* opinion was written by the late Judge Cire when he was serving on the Texas Court of

Civil Appeals. Judge Cire was the United States District Judge who rendered the district court decision in the case which is before us. It strengthens the application of the state law for the district judge who applied it to have been the judge who created the authoritative state interpretation when he was on the state court. In any event, we give some deference to interpretations of state law by the district judges because of their particular knowledge of local law. *NCH Corp. v. Broyles,* 749 F.2d 247, 253 n. 10 (5th Cir.1985). Judge Cire knew what the law of the State of Texas was with respect to express waiver. We accept his interpretation.

We conclude that the State of Texas has not waived expressly its sovereign immunity beyond that contained in Section 19 of the statute which gives state employees coverage only under the Texas Workers' Compensation law if the agency has adopted that law.

### V.

Appellant makes a final analytical assertion that the State of Texas, by applying its own workers' compensation law to this injury of a maritime employee, has placed an unconstitutional condition upon its assertion of sovereign immunity. Reliance is grounded upon the Supreme Court case of *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), which held that state workers' compensation statutes could not apply to injuries occurring on navigable waters.

Such an unconstitutional conditions analysis is not relevant here. The *Jensen* case did not concern itself with a maritime employee of a state. Instead, as must be emphasized throughout in the consideration of this and similar cases, the Court was dealing with private maritime employment. The analysis must be under the doctrine of sovereign immunity and the Eleventh Amendment. The established law is that the State of Texas, absent waiver, is not subject to suit in federal court under a statute passed as part of the federal plenary regulatory powers unless the federal

government has expressly undertaken in terms within the statute to require waiver of immunity under that statute. This leaves the state free to provide workers' compensation for injuries to its own employees as against a suit in federal court. Otherwise, there would be a federally imposed remedy abrogating sovereign immunity without expressed intention to impose such a remedy. In terms this is inconsistent with *Atascadero* and also the principle of the political control of federal regulation by the states acting through the Congress which the Court emphasized in the *Garcia* case. 105 S.Ct. at 1018.

### VI.

We hold that since Congress has not in terms within the Jones Act required waiver of state immunity as to the maritime employees of the states, and there has been no actual waiver by the state, the State of Texas was not subject to suit by an injured state maritime employee in federal court under the Jones Act. The decision of the district court denying Jones Act recovery to appellant, a maritime employee of the State of Texas, is in accordance with the law.

**AFFIRMED.**

THOMAS GIBBS GEE, Circuit Judge, specially concurring:

I concur in Judge Williams' careful opinion, writing separately only to confess an earlier error. Although, for the reasons given in my writing for the panel in this case at 739 F.2d 1034, I believe it was incorrectly reasoned, further reflection has convinced me that *Lyons v. Texas A & M University,* 545 S.W.2d 56 (Tex.Civ.App.— Houston [14th Dist.] 1977, writ ref'd, n.r.e.) is an authoritative interpretation of state law by a Texas court, one which we are duty bound to follow. Under Texas practice, the notation "writ ref'd n.r.e." indicates that the Texas Supreme Court was not satisfied that the opinion of the intermediate appellate court correctly declared the law in all respects, but that no error was present that required reversal of its

judgment. The *Lyons* opinion is therefore of a species that represents the most doubtful of Texas appellate authority. Nevertheless, it *is* Texas authority, and the holding in question was crucial to the judgment—which cannot have been correct if it was wrong. I therefore agree that we are bound by it.

PATRICK E. HIGGINBOTHAM, Circuit Judge, with whom Judges GARWOOD and ROBERT MADDEN HILL join, specially concurring:

I join the majority opinion but emphasize that the decision of the Supreme Court in *Scanlon* is but a specific application of a broader principle—one essential to the implementation of its concept that states must fight for their sovereignty in the political arena, as found in its *Garcia* holding.

The posed question is whether a seaman employed by the State of Texas is covered by the Jones Act. Its answer challenges our ability to write clear rules for deciding which federal statutory regulatory schemes include states. Ironically, our challenge is best met by passing it to the Congress through the familiar principle that we will not infer that legislation applies to the states. So the Court teaches, if in a subtle way, in *Garcia, Employees* and *Edelman* and now, more pointedly, in *Scanlon.*

The first inquiry, not addressed by the majority, is whether the federal statute applies to state operations at all. The concepts of federalism upon which *Garcia* assertedly rests require that we construe federal statutes to exclude states from their coverage unless Congress expressly indicates otherwise. If a federal statute does not recite its applicability to states, the inquiry should end. Only if a federal law explicitly governs state behavior do we reach the question of whether the Eleventh Amendment bars a private citizen from suing under the federal statute in federal court.

**I**

The core holding of *Garcia v. San Antonio Metropolitan Transit Authority,* —— U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) is that Congress's power to impose its will upon the states is limited by the structural arrangement of our federal system, rather than by ad hoc judicial line calls as to when federal legislation infringes upon "traditional" or "fundamental" state powers. The protections of state power built into the federal system, such as equal state representation in the Senate, are said to find their expression in the outcomes of political struggles, of political not judicial process. As the Court observed in *Garcia,* many federal statutes expressly exempt states from coverage, reflecting state success in the federal political arena. *See* 105 S.Ct. at 1019. Others, such as the Fair Labor Standards Act at issue in *Garcia,* expressly include states in their sweep. *See* 105 S.Ct. at 1008–09.

The more difficult question is when the courts should infer that Congress meant to subject states to federal regulation if a federal statute is by its terms applicable to a broad group such as "any seaman" or "any person," but makes no reference to states. In rejecting judicial refereeing and measures of the level of intrusion into state affairs by a federal statute, *Garcia* necessarily holds that the answer cannot be "sometimes." Being forced to deduce whether states have been brought within a federal statutory scheme based on the peculiar attributes of the scheme "inevitably invites an unelected federal judiciary to make decisions about which ... policies it favors and which ones it dislikes." 105 S.Ct. at 1015.

But there is a more direct corollary of *Garcia:* federal statutes not expressly applicable to states are not. Although *Garcia's* specific holding extended FLSA coverage to public transit systems, the Court reaffirmed that "the States occupy a special and specific position in our constitutional system," 105 S.Ct. at 1020, and that there are "undoubtedly" limits on the federal power "to interfere with state functions ...," 105 S.Ct. at 1016. *Garcia* concludes that the primary limit on this power

is the political process of state participation in federal decisionmaking. If this process is to have its force, legislation that is meant to affect states must say so; states will then be aware of proposed federal legislation perceived to intrude into their operations, and will be able to draw their political weapons. But if legislation is silent or half-heartedly ambiguous as to its effect on states, and a court later declares that it applies to states, the process will have been skewed and the states will have been effectively sandbagged. The result would be a sidestepping of the structural protections outlined in *Garcia* and a return of the judges from the sidelines.

Insistence on express articulation of congressional purpose is not only internal to *Garcia,* but is a long-recognized safeguard of federalism. In *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), the Supreme Court said:

> In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

The *Parker* Court applied this principle by holding that the Sherman Act did not apply to state conduct, even though that act purports to govern the behavior of all "persons." *See also Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 666–68, 99 S.Ct. 2529, 2537–38, 61 L.Ed.2d 153 (1979) ("white persons" referred to in 25 U.S.C. § 194 includes most artificial entities, but not states); *Weber v. Board of Harbor Commissioners,* 85 U.S. (18 Wall.) 57, 70, 21 L.Ed. 798 (1873) ("Statutes of limitation are not ... held to embrace the State, unless she is expressly designated, or necessarily included by the nature of the mischiefs to be remedied"). In addition, in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 24, 101 S.Ct. 1531, 1543, 67 L.Ed.2d 694 (1981), the Court, construing the Developmentally Disabled Assistance and Bill of Rights Act, demanded that Congress "express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds."

The requirement of explicit statement has also long governed the applicability of federal statutes to the federal government. In *United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), the Court held that the Clayton and Norris-LaGuardia Acts' prohibition of suits by "employers" to enjoin strikes did not restrain the United States. The Court noted the "old and well-known rule that statutes which in general terms divest preexisting rights or privileges will not be applied to the sovereign without express words to that effect." *Id.* at 272, 67 S.Ct. at 686; *see also United States v. Wittek,* 337 U.S. 346, 358–59, 69 S.Ct. 1108, 1114, 93 L.Ed. 1406 (1949); *United States v. Stevenson,* 215 U.S. 190, 197, 30 S.Ct. 35, 54 L.Ed. 153 (1909); *Dollar Savings Bank v. United States,* 86 U.S. (19 Wall.) 227, 239, 22 L.Ed. 80 (1873). Even when concerns of sovereignty are absent, the courts have insisted upon plain expressions of congressional purpose to highlight the line between congressional and judicial roles in other contexts, such as with the expressed reluctance to imply private rights of action according to needs perceived by courts. *See, e.g., Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979).

In short, were we writing on a clean slate, we ought unhesitatingly to apply the principle of express congressional articulation to the Jones Act. That act covers "[a]ny seaman who shall suffer personal injury in the course of his employment...." 46 U.S.C. § 688. If we insisted upon explicit Congressional statement the Jones Act would not apply to state employees.

Yet the slate is not clean. Most relevant here, it is marked by *Petty v. Tennessee-Missouri Bridge Commission,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959). Like this case, *Petty* was a Jones Act suit by an injured employee of a state-operated

ferry. The *Petty* court held that because Congress did not expressly *exempt* states from the operation of the Jones Act, states were Jones Act "employers." 359 U.S. at 282–83, 79 S.Ct. at 790–791.

While *Garcia* must ultimately lead to the rejection of *Petty's* construing presumption, *Garcia* itself did not do so, because it construed a statute that expressly governs state workers. *Petty's* substantive reading of the Jones Act as covering state-employed seamen remains unquestioned in any other later Supreme Court case; the Court, rather, has chosen to distinguish *Petty* on its facts. *See Edelman*, 415 U.S. at 672, 94 S.Ct. at 1360. We cannot do the same here because our case involves the same statute and, indeed, virtually identical facts. Until the Court reconsiders the Jones Act holding of *Petty*, I concede, as I must, that it binds.

If a federal statute does not expressly include state operations, it is, under my view, properly read as inapplicable to states and no question of waiver of Eleventh Amendment immunity would be present. As far as the states are concerned, such a statute is identical to one that expressly exempts states. There is no federal right for state employees to lay claim to, and the state's invocation of its Eleventh Amendment immunity is not reached. Waiver of state immunity under the Eleventh Amendment would arise then only when the statute was expressly applicable to the states but silent or inexact with regard to the state's right to be free of suits by private citizens in federal court.

I concur in the majority's conclusion that Congress did not abrogate the immunity enjoyed by Texas under the Eleventh Amendment. In doing so, I reluctantly concur in its implicit conclusion that Jones Act seamen include employees of the state.

JOHN R. BROWN, Circuit Judge, with whom ALVIN B. RUBIN, REAVLEY, POLITZ, TATE, and JOHNSON, Circuit Judges, join, dissenting:

Because the opinion by Judge Williams for the Court treats two Supreme Court decisions as though they no longer have any binding vitality and because those decisions command a determination (i) that the Jones Act applies to vessels owned or operated by a state; and, (ii) that the abrogation of Eleventh Amendment[1] immunity which is clearly established for FELA cases, is necessarily extended to the Jones Act, which incorporates FELA, I must dissent.

As is obvious from what I believe to be the important questions, the answer is one of Congress' constitutional power and how it has been exercised. To my way of thinking, the crucial point is whether Congress has abrogated state immunity to suit, not whether there has been a waiver on the part of Texas, a maritime employer.[2] Unlike the majority, I do not see waiver as relevant.[3] It is my opinion that the Supreme Court has ruled that the FELA abrogates state Eleventh Amendment immunity. In the Jones Act case before us, involving the same statute, we cannot hold differently.

---

**1.** The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

**2.** Much of the confusion in Eleventh Amendment jurisprudence derives from courts' casual use of the terms waiver, consent, and abrogation. Actually, these terms represent distinct concepts and the difference between them is crucial for a correct understanding of the case

before us. Waiver or consent concerns a state's acquiescence, either expressly or impliedly; abrogation deals with congressional action.

**3.** The majority concludes that waiver is applicable only to suits brought by private citizens. With this I have no disagreement. The opinion also concludes that a state's refusal to waive has broader implications than just barring suits in federal court. Regardless of the merits of this analysis, I believe it has no application to the case before us because the Jones Act, passed pursuant to Congress' plenary admiralty power has been held to include the states.

## I. Admiralty Supreme

My view is that Article III of the Constitution gives Congress plenary power over admiralty and maritime matters. Our framers did this for a very understandable reason. Almost all commerce at the time of our nation's founding was waterborne. In order to allow for the free flow of trade across occasionally jealous and protectionist state boundaries, the delegates meeting in Philadelphia made Congress the custodian of power over both interstate commerce and admiralty. Moreover, the Constitution makes a distinction between its grant to Congress of power over interstate commerce and its allocation to the federal government of exclusive jurisdiction over admiralty. As I see it, this distinction in phraseology was deliberate then, and is of crucial significance now. It is crucial because Congress is given a special interest in maintaining the uniformity of admiralty and has exercised its plenary power over maritime matters in enacting the Jones Act. In doing so,

> [T]heir purpose was not to strike down or abrogate the system, but to place the entire subject—its substantive as well as its procedural features—under national control because of it intimate relations to navigation and to interstate and foreign commerce.

*Panama Railroad Co. v. Johnson,* 264 U.S. 375, 386, 44 S.Ct. 391, 393, 68 L.Ed. 748, 755 (1924).

In exercising its exclusive power over admiralty, Congress chose expressly to make the provisions of the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51 *et seq.,* an integral part of the Jones Act. If there was any question about this incorporation from the statutory language or legislative history of the Jones Act, a long line of Supreme Court decisions has removed all doubt.[4] Since this incorporation

has been determined to be constitutional, the question for us to resolve is whether there is any collision between Congress' plenary admiralty power and the Eleventh Amendment. My view is that the framers' interest in the uniformity of admiralty—revealed in the almost unquestioned delegation of power over admiralty matters to the United States government with little dissent even on the part of the antifederalists—mandates the conclusion that Texas, as a maritime employer, is subject to the Jones Act.

A remaining consideration then is whether the Eleventh Amendment, under the interpretations given it by the Supreme Court that extend its scope beyond the face of its language, bars federal court proceedings.

This dissent is divided into the following analytical framework: Part II discusses the plenary nature of the admiralty power granted to Congress by the Constitution. Part III deals with the Jones Act, its incorporation of the FELA, and its abrogation of state immunity. Part IV then considers the Supreme Court's recent pronouncements on federalism in *Garcia* and *Atascadero.*

## II. Congress' Admiralty Power is Plenary

As the Jones Act begins with Article III, Section 2 of the Constitution, so do I. This article extends the judicial power of the United States "to all cases of admiralty and maritime jurisdiction". In addition, Article I, Section 8, confers upon Congress the power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the government of the United States or in any department or offices thereof." In *South-*

---

4. Indeed, the Supreme Court in *Panama Railroad Co. v. Johnson,* 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924), considered the Jones Act's incorporation of the FELA in an attack upon the Jones Act's constitutionality. The court said: [c]riticism is made of the statute because it does not set forth the new rules but merely

adopts them by a generic reference. But the criticism is without merit. The reference ... is a recognized mode of incorporating one statute or system of statutes into another, and serves to bring into the latter all that is fairly covered by the reference.

*ern Pacific Co. v. Jensen*, 244 U.S. 205, 215, 37 S.Ct. 524, 528, 61 L.Ed. 1086 (1917), the Supreme Court stated "it must now be accepted as settled doctrine that, in consequence of these provisions, Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country." As the Court emphasized, the original Judiciary Act of 1789 gave district courts of the United States "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction ... saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." [5] *Id.* at 215, 37 S.Ct. at 528.

In *Workman v. Mayor, Alderman, and City of New York*, 179 U.S. 552, 560, 21 S.Ct. 212, 215, 45 L.Ed. 314 (1900), the Court made clear that the framers desired uniformity in maritime jurisprudence; accordingly, they assigned the admiralty power exclusively to Congress:

> [i]t would be a strange distinction to persons coming with their ships to different ports of this country, that in some ports, if they sustained damages by the negligence of those who have management of the docks, they will be entitled to compensation, and in others they will not; such a distinction arising, not from any visible difference in the docks themselves, but from some municipal differ-

ence in the constitution of the bodies by whom the docks are managed.

*See also Ex Parte Garnett*, 141 U.S. 1, 13, 11 S.Ct. 840, 842, 35 L.Ed. 631 (1891).[6]

The Supreme Court has long held that the Constitution empowered Congress to legislate exclusively over matters within the admiralty and maritime jurisdiction.[7] As the Supreme Court stated in *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 156, 40 S.Ct. 438, 64 L.Ed. 834, 838 (1920), "the necessary consequence [of any other conclusion] would be destruction of the very uniformity in respect of maritime matters which the Constitution was designed to establish." The Constitution

> took from the states all power, by legislation or judicial decision, to contravene the essential purposes of, or to work material injury to, characteristic features of such law, or to interfere with its proper harmony and uniformity in its international and interstate relations.

*Id.* 253 U.S. at 160, 40 S.Ct. at 440. In *Knickerbocker* the Court also recognized, and chose to emphasize, that Congress' admiralty power was much greater than its power to regulate interstate commerce. "The distinction between the indicated situation created by the Constitution relative to maritime affairs and the one resulting from the mere grant of power to regulate commerce, without more, should not be forgotten." *Id.* at 160, 40 S.Ct. at 440.[8]

---

**5.** Today in 28 U.S.C. § 1333(1), Congress has vested in federal district courts original and exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases other remedies to which they are entitled."

**6.** The *Garnett* Court stated: "[t]he Constitution must have referred to a system of law co-extensive with, and operating uniformly in, the whole country. *It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several states, as that would have defeated the uniformity and consistency at which the Constitution aimed* on all subjects of a commercial character affecting the intercourse of the states with each other or with foreign states." *Id.* (emphasis added).

**7.** In *State of Washington v. Dawson & Co.*, 264 U.S. 219, 224, 44 S.Ct. 302, 68 L.Ed. 646 (1924), the Supreme Court said "well established is the

rule that state statutes may not contravene an applicable act of Congress, or affect the general maritime law.... No such legislation is valid if it contravenes the essential purpose expressed by an act of Congress, or works a material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations. This limitation, at the least, is essential to the effective operation of the fundamental purposes for which such law was incorporated into our national laws by the Constitution itself."

**8.** As a further demonstration of Congress' plenary power over admiralty matters, consider the Admiralty Jurisdiction Extension Act. This Act, which extends the reach of the admiralty courts beyond what was commonly accepted as a limit on their power, has been held constitutional as against contentions that it was an unauthorized congressional extension of admiralty and mari-

Thus, the plenary power of Congress over admiralty has long been upheld.[9] It is more extensive than Congress' power over interstate commerce. If, however, Congress neglects to expressly include the states within the scope of a maritime enactment—as it did in passing the Jones Act—there remains the question of whether the statute applies to the states. Our inquiry must focus on the congressional abrogation of state immunity under the Jones Act; if abrogation is found, the Eleventh Amendment does not forbid suit in federal court.

### III. The Jones Act Abrogates State Immunity to Suit

The Jones Act provides that:

*any seaman* who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action *all statutes of the United States modifying or extending the common law right or remedy in case of personal injury to railroad employees shall apply;* and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. *Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.*

46 U.S.C. § 688 (emphasis added).

The FELA, incorporated by the Jones Act, provides in part:

*[e]very common carrier* by railroad while engaging in commerce between any of the several states ... *shall be liable* in damages *to any person* suffering injury while he is *employed by any such carrier* in such commerce ... [and that] [u]nder this chapter an *action may be brought in a district court of the United States....*

45 U.S.C. §§ 51, 56 (emphasis added). In *Panama Railroad Co. v. Johnson,* 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924), the Supreme Court expressly held that the Jones Act was enacted pursuant to Congress' admiralty powers. *See also Engel v. Davenport,* 271 U.S. 33, 46 S.Ct. 410, 70 L.Ed. 813 (1926); *Kendell v. United States,* 37 U.S. 524 (12 Pet. 524), 9 L.Ed. 1181 (1838); *In re Health,* 144 U.S. 92, 12 S.Ct. 615, 36 L.Ed. 358 (1892). The extent to which Congress forbade any limitation, restriction, or reduction of these rights is reflected in § 55 of FELA:

Any contract, rule, regulation, or device whatsoever, the purpose of intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void.

45 U.S.C. § 55. This broad, remedial statute provides a remedy to *all seamen;* thus, I now turn to consider whether this exercise of plenary authority over admiralty is on a collision course with the Eleventh Amendment when it is invoked to provide a remedy for a state-employed seaman.

### Petty is Decisive
### Jones Act Applies to States

There is no question whether the Jones Act applies to state-operated vessels. That

---

time jurisdiction. *See United States v. Matson Navigation Co.,* 201 F.2d 610 (9th Cir.1953); *Pure Oil Co. v. Snipes,* 293 F.2d 60 (5th Cir. 1961); *Gutierrez v. Waterman SS Corp.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), *rehearing denied,* 374 U.S. 858, 83 S.Ct. 1863, 10 L.Ed.2d 1082 (1963); *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), *rehearing denied,* 404 U.S. 1064, 92 S.Ct. 731, 30 L.Ed.2d 753 (1972); *Pittston Stevedoring Corp. v. Dellaventura,* 544 F.2d 35, 56 (2d Cir. 1976), *aff'd, Northeast Marine Terminal Co. v.*

*Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

9. In *Ex Parte Garnett,* 141 U.S. 1, 14, 11 S.Ct. 840, 843, 35 L.Ed. 631 (1891), the Court said "the Constitution extends the judicial power of the United States to 'all cases of admiralty and maritime jurisdiction,' and as this jurisdiction is held to be exclusive, the power of legislation on the same subject must necessarily be in the National Legislature, and not in the State Legislature."

has already been authoritatively determined by the Supreme Court's decision in *Petty v. Tennessee-Missouri Bridge Commission,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959). In *Petty,* the Supreme Court declared that the states of Tennessee and Missouri were subject to the Jones Act by their operation of a ferry.

> [W]e can find no more reason for excepting state or bi-state corporations from 'employer' as used in the Jones Act than we could for excepting them either from the Safety Appliance Act (*United States v. California,* 297 U.S. 175,, 80 L.Ed. 567, 56 S.Ct. 421) or the Railway Labor Act (*California v. Taylor,* 353 U.S. 553, 1 L.Ed.2d 1034, 77 S.Ct. 1037). In the latter case we reviewed at length federal legislation governing employer-employee relationships and said, 'When Congress wished to exclude state employees, it expressly so provided.' 353 U.S. at 564, 77 S.Ct. at 1043. The Jones Act (46 U.S.C. § 688) has no exceptions from the broad sweep of the words "Any seaman who shall suffer personal injury in the course of his employment may", etc. The rationale of *United States v. California* and *California v. Taylor* makes it impossible for us to mark a distinction here and hold that this bi-state agency is not an employer under the Jones Act.

*Id.* 359 U.S. at 282–83, 79 S.Ct. at 790–91.

It bears emphasis that although the compact power and the states' acceptance of Congress' conditions were significant for the majority's decision in *Petty* on the Eleventh Amendment, the Court was essentially unanimous on the clear holding that the Jones Act applied to the states. Adding universality to the term "any seaman" in the Jones Act is the Court's observation that "[t]here is no more apt illustration of the involvement of the commerce power and the power over maritime matters than

the Jones Act." *Id.* at 281, 79 S.Ct. at 789–90.

### Parden is the Answer

Within five years of *Petty's* determination that the Jones Act applies to state-operated vessels, *Parden v. Terminal Railway Co.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), held that FELA was effective to abrogate Eleventh Amendment immunity for a state-operated, interstate railway. *Parden* is still the law. It has yet to be overruled, and its constant citation [10] is living proof that it is still alive, well and controlling.

Although some of the Supreme Court's language in *Parden* speaks in terms of a "waiver" by Alabama of its immunity to suit, I firmly believe that *Parden* stands for Congress' abrogation of the states' Eleventh Amendment immunity in FELA. The essential principle of *Parden* is that "when a state leaves the sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation." *Id.* 377 U.S. at 196, 84 S.Ct. at 1215. This is shown convincingly from the structure of the Court's reasoning. The Court said:

> By adopting and ratifying the Commerce Clause, the states empowered Congress to create such a right of action against interstate railroads; by enacting the FELA in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus consented to suit.

*Id.* 377 U.S. at 192, 84 S.Ct. at 1213. While the Court speaks occasionally in terms of waiver, its rationale is really one of the exercise of constitutional power.[11] Any

---

**10.** As recently as the preceding term, the Supreme Court has cited *Parden* as a precedent controlling its decisions on Eleventh Amendment immunity. *See County of Oneida, New York v. Oneida Indian Nation,* — U.S. —, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985).

**11.** In *Peel v. Florida Department of Transportation,* 600 F.2d 1070, 1080–81 (5th Cir.1979), we said:

> [a] more consistent rationale is that a state can consent to private damage actions when *Congress* manifests a sufficient purpose to ab-

talk of waiver was purely a palliative for holding states subject to the act of Congress. A spoonful of sugar always helps the medicine go down. Indeed, in its discussion of the palliative nature of waiver, the *Parden* Court reveals that congressional power—not consent or acquiescence by Alabama—is what is at stake because otherwise "the congressional power to condition such an act upon amenability to suit would be meaningless if the state, on the basis of its own law or intention, could conclusively deny the waiver and shake off the condition." *Id.* 377 U.S. at 196, 84 S.Ct. at 1215.

Thus, the allusions to waiver, despite later efforts to structure or depict them as such, are by no means the Court's basis for holding Alabama liable in *Parden.* This can be seen from the way in which the Court stated the issue:

> Here, for the first time in this court, a state's claim of immunity against suit by an individual meets a suit brought upon a cause of action expressly created by Congress. Two questions are thus presented (1) did Congress in enacting the FELA intend to subject a state to suit in these circumstances? (2) did it have the power to do so, as against the state's claim of immunity?

*Id.* 377 U.S. at 187, 84 S.Ct. at 1210. As *Parden* said of the FELA—in language swallowed up hook, line, and sinker by the Jones Act:

> *We think that Congress, in making the FELA applicable to 'every' common carrier* by railroad in interstate commerce *meant what it said.* That congressional statutes regulating railroads in interstate commerce apply to such railroads, *whether they are state owned or privately owned* is hardly a novel proposition; it has twice been clearly affirmed by this court.

*Id.* 377 U.S. at 187–88, 84 S.Ct. at 1210–11 (emphasis added).

In *Parden,* of course, the Court was speaking of Congress' power under the commerce clause. It found that an exercise of pure power on the part of Congress was sufficient to abrogate the states' immunity. The states had ceded to Congress, for the national good that uniformity would bring, that portion of their sovereignty dealing with the power to regulate interstate commerce. In the Court's view, the decision to regulate employers of interstate railway workers, be they private parties or state governments, was for Congress alone.

While a state's immunity from suit by a citizen without its consent has been said to be rooted in the 'inherent nature of sovereignty,' the states surrendered a portion of their sovereignty when they granted Congress the power to regulate commerce.

If Congress made the judgment that, in view of the dangers of railroad work and the difficulty of recovering for personal injuries under existing rules, railroad workers in interstate commerce

rogate a state's immunity. Under this approach, the state waived its immunity from suit in federal court at the same time it surrendered its sovereign immunity and gave Congress the power to legislate under delegated powers. As recognized by Chief Justice Hughes in an early case involving sovereign immunity, "States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.'" *Monaco v. Mississippi,* 292 U.S. 313, 322–23, 54 S.Ct. 745, 748, 78 L.Ed. 1282 (1934) (quoting The Federalist No. 81) (A. Hamilton footnote omitted). This rationale removes the Eleventh Amendment as a bar whenever Congress validly has exercised its powers.

[I]n exercising her rights, a state cannot disregard the limitations which the federal constitution has applied to her power. Her rights do not reach to that extent. Nor can she deny to the general government the right to exercise all its granted powers, though they may interfere with the full enjoyment of the rights she would have if those powers had not been thus granted. Indeed, every addition of power to the general government involves a corresponding diminution of governmental powers of the states. It is carved out of them.

*Peel* at 1080–81, *quoting Fitzpatrick v. Bitzer,* 427 U.S. 445, 454–55, 96 S.Ct. 2666, 2670–71, 49 L.Ed.2d 614 (1976), *quoting Ex Parte Virginia,* 10 Otto 339, 346–48, 100 U.S. 339, 346–48, 26 L.Ed. 676 (1880).

should be provided with the right of action created by the FELA, we should not presume to say, in the absence of express provision to the contrary, that it intended to exclude a particular group of such workers from the benefits conferred by the Act.

*Id.* 377 U.S. at 191, 84 S.Ct. at 1212 (citations omitted).

In language about the commerce power which rings even truer about Congress' power over admiralty, the *Parden* Court said:

This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent and acknowledges no limitations other than are prescribed in the Constitution.... If, as has always been understood, the sovereignty of Congress, though limited to specified objects is plenary as to those objects, the power over commerce within foreign states, and among the several states, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States. *Gibbons v. Ogden*, 9 Wheat 1, 196–97, 6 L.Ed. 23, 70 (1824).

*Id.* 377 U.S. at 191, 84 S.Ct. at 1212.

The admiralty power is more extensive than the commerce power, in the sense of the states' inability to infringe upon admiralty's national uniformity. The Jones Act, an exercise of this broad, plenary power, by its very terms incorporates the FELA which the Supreme Court holds abrogates a state's Eleventh Amendment immunity. In light of these observations, *Parden*, which abolished state immunity for state railroad employees covered by the FELA, must do the same for state seamen because their rights come from the same statute. "By engaging in the railroad business a state cannot withdraw the railroad from the power of the federal government to regulate commerce." *New York v. United States*, 326 U.S. 572, 582, 66 S.Ct. 310, 314, 90 L.Ed. 326, 333 (1946). Similarly, by operating a ferry, the State of Texas cannot remove the ship or the seamen on her

from the power of the federal government to regulate maritime activities. *See Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 674–75, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300, 306 (1982).

### Fifth Circuit Bridge Act Cases Inconsequential

The importance of Congress providing a private cause of action as evidence of an intent to abrogate the states' immunity to suit is nicely shown in reverse by our cases considering the Bridge Act: *Intracoastal Transportation v. Decatur County, Georgia*, 482 F.2d 361 (5th Cir.1973), and *Freimanis v. Sea-Land Service*, 654 F.2d 1155 (5th Cir.1981). In *Intracoastal* we concluded that the "Bridge Act of 1906 does not create a cause of action in private parties"; consequently, we sustained the state's claim to immunity. Similarly, in *Freimanis* we focused on the lack of a private remedy for violations of the Rivers and Harbors Appropriation Act of 1899. We specifically juxtaposed Congress' lack of intention to give a private cause of action in these Acts with Congress' clear intention to sanction private action in the FELA.

Congress in exercising this regulatory authority over navigation did not, as it had in the Federal Employers' Liability Act, create any civil cause of action in favor of private parties injured by any violation of the Act. Rather, it chose to achieve its regulatory purposes through specific penal statutes.

*Id.* at 1160, *quoting Red Star Towing v. Department of Transportation of New Jersey*, 423 F.2d 104, 105–06 (3d Cir.1970). Thus, in contradistinction to the Jones Act and its incorporation of the FELA,

the presently relevant statute regulating the bridging of navigable streams does not confer any new civil remedy upon private parties and thus cannot by logical inference be read as intended to impose equivalent civil liability upon an otherwise immune state.

*Red Star Towing*, 423 F.2d at 106.

### Parden is Still Alive

The majority suggests—if it does not squarely hold—that *Parden* has been sig-

nificantly limited by the Supreme Court in *Employees v. Dept. of Public Health*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), and in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In note 1 of *Employees* the majority states that *Parden* was premised on the conclusion that Alabama, by operating the railroad, had consented to suit in the federal courts under the FELA. I simply do not subscribe to this view. I believe that the essential principle of *Parden*—state liability to federal suit when Congress acts pursuant to a plenary power—remains unaffected by *Employees* and *Edelman*, and I now consider the very different situations before the Court in the two cases.

The Court in *Employees* stated that *Parden* concerned only a rather isolated state activity, whereas *Employees* dealt potentially with all office workers in the state government of Missouri. Most importantly, *Employees* concerned the application of the Fair Labor Standards Act (FLSA). By the very terms of the original FLSA, states were exempted from coverage. Confusion arose because of a later congressional amendment that concerned state hospital employees. The Court decided that it would:

> be surprising in the present case to infer that Congress deprived Missouri of her constitutional immunity without changing the old § 16(b) under which she could not be sued or indicating in some way by clear language that the constitutional immunity was swept away.

*Employees* 411 U.S. at 285, 93 S.Ct. at 1618.

In *Employees* the Court merely declined "to extend *Parden* to cover every exercise by Congress of its commerce power, where the purpose of Congress to give force to the Supremacy Clause by lifting the sovereignty of the states and putting the states on the same footing as other employers is not clear." *Id.* 411 U.S. at 286–87, 93 S.Ct. at 1618–19. Thus, the Court refused to find abrogation of state immunity because there was a confusing expression on the part of Congress. First the FLSA had

clearly exempted states; a later amendment then introduced confusion. There is no such confusion with the Jones Act or the FELA. It has long been established that the FELA includes *every* employer and gives *every* employee of an interstate railroad a cause of action.

Indeed, using the Supreme Court's own method of distinguishing *Employees* from *Parden*, we have in the case before us only the isolated activity of operating a ferry. This activity is the equivalent of the operation of a railroad in interstate commerce through the Jones Act's incorporation of FELA. It is not the widespread type of intrusion upon all governmental functions of the states that would have resulted from extending FLSA in *Employees*. In *Employees*, the Court's reluctance to find the necessary intention to include the states within the FLSA was influenced by Congress' confusing amendments. This confusion, as the Supreme Court held, showed a lack of congressional intention to abrogate the states' immunity.

The next case setting out the Supreme Court's approach to the Eleventh Amendment and state immunity is *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Court in *Edelman* examined Aid to the Aged, Blind, or Disabled (AABD), a federal program funded by the state and federal governments, and administered by state officials. *Edelman* had to deal with both *Parden* and *Employees*. The Court, emphasizing the critical significance of abrogation and the absence of a private right of action, said:

> the question of waiver or consent under the Eleventh Amendment was found in those cases to turn on *whether Congress had intended to abrogate the immunity* in question, and whether the state by its participation in the program authorized by Congress had in effect consented to the abrogation of this immunity.
>
> *But in this case the threshold fact of congressional authorization to sue a class of defendants which literally includes states is wholly absent.* Thus, respondent is not only precluded from

relying on this court's holding in *Employees*, but on this court's holding in *Parden* and *Petty* as well. (emphasis added).

*Edelman* 415 U.S. at 672, 94 S.Ct. at 1360.

Thus, in *Edelman*, a class action seeking declaratory and injunctive relief against state administrators, the Court applied an analysis to the AABD which lends support to my view that *Parden* was not limited by *Employees*. The Court's language indicates that its note one in *Employees* was an overly broad attempt to distinguish *Parden* because, unlike the *Employees* note, *Edelman* says *Parden* was founded on Congressional intent—and power—to abrogate state immunity by creating a private cause of action.[12] Further, *Edelman* uses the same analysis to distinguish *Employees* which I maintain distinguishes *Employees* from *Parden:* that is, *Edelman* read *Employees* as a case which focused on the confusion Congress created in the FLSA by first exempting the states, then trying to include part of their workers.

As I have stated, there has never been any confusion about the Jones Act's incorporation of the FELA's clear language and its binding application to state operated vessels; and FELA has long been held to apply to the states and to abrogate their Eleventh Amendment immunity to suit in federal court. When it is understood that *Edelman* was concerned only with state participation in a program through which the federal government provided assistance for the state's operation of a system of public aid, it comes as no surprise that the Eleventh Amendment was held to be a bar to suit in federal court. In grant-in-aid programs, the principle of state court adjudication is clear unless Congress expressly indicates that the program allows suit in federal court. But the *Edelman* Court's discussion of waiver places no restriction upon *Parden's* holding that FELA abrogates state immunity to suit.[13]

## IV. The Rationales of Garcia & Atascadero *Support the Jones Act Abrogation of the State's Eleventh Amendment Immunity*

The recent pronouncements of the Supreme Court in its continuing exegesis of the role of the several states in the federal system are reminiscent of Doctor Doolittle's two-headed llama, the Pushmi-Pullyu.[14] Since the case before us was argued, the Supreme Court has handed down *Garcia*[15] and *Atascadero*.[16] I confront *Garcia* because of its focus upon the structure of our federal system. I must similarly confront *Atascadero* because of the sweeping language which the Court used in interpreting the scope of the Eleventh

---

**12.** The *Edelman* Court said: *"Parden* ... involved a congressional enactment which by its terms authorized suit by designated plaintiffs against a general class of defendants which literally included states...." *Id.* 415 U.S. at 672, 94 S.Ct. at 1360.

**13.** Thus, the *Edelman* Court said the "mere fact that a state participates in a program through which the federal government provides assistance for the operation by the state of a system of public aid is not sufficient to establish consent on the part of the state to be sued in the federal courts." *Id.* at 674, 94 S.Ct. at 1361. It is with the distinction between waiver and abrogation in mind that *Edelman* said of grant-in-aid programs:

constructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here. In deciding whether a state has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated by the most express language or by such overwhelming implications from the test as [will] leave no room for any other reasonable constructions. (citations omitted). *Id.* at 673, 94 S.Ct. at 1361.

**14.** A pushmi-pullyu is the rarest of all creatures. It is a most unusual creature, having two heads—one at either end of its body. As a consequence of the different perspectives offered to either head, a pushmi-pullyu is engaged in a constant tug of war with itself. It moves first this way, then that—but never does it move very far in either direction. *See* Lofting, "The Story of Doctor Doolittle" in *Anthology of Children's Literature,* 624 (4th ed. 1970).

**15.** *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

**16.** *Atascadero State Hospital v. Scanlon,* 473 U.S. ——, 105 S.Ct. 314, 87 L.Ed.2d 171 (1985).

Amendment. While it is my opinion that on the facts before us *Parden* and *Petty* establish Texas' liability to federal suit under the Jones Act because the Supreme Court has never disturbed their holdings, I also believe that, properly understood, *Garcia* and *Atascadero* do not detract from my conclusion that the Jones Act effectively abrogates Texas' Eleventh Amendment immunity.

The significance of *Garcia* is its focus upon the political process as the best way for the states to protect themselves from unduly broad regulation by the federal government in our federal system. *Garcia* is an important case not only for what it says, but for the posture in which the decision comes down. It stands for the proposition that states must fight for their sovereignty in the political arena. In essence, the water-mark for state sovereignty was illustrated by *National League of Cities,*[17] concern for the integrity of traditional governmental functions and by *Pennhurst's*[18] concern for "clear statements" in grant-in-aid programs.

Now, however, the Court has handed down *Garcia* in its repudiation of its decision in *National League of Cities.* I believe *Garcia* reaffirms the principles of *Parden.* When Congress acts pursuant to a plenary power—one unrestrained within its constitutionally delegated bounds—the states must be affirmatively exempted through the political process if they are to escape inclusion within a regulatory scheme in an area where national uniformity is important.

In *Garcia,* the Supreme Court looked to the political process, not the judicial process, for the states' power to protect themselves from excessive congressional regulation. This requires an affirmative act on the part of Congress to exclude states from

the reach of its plenary power—in holding otherwise, the majority risks attributing to Congress the now judicially discredited distinctions between traditional state governmental and nongovernmental functions. *Garcia* clearly rejected this method of analysis which has been generated by *National League of Cities.* Accordingly, it is for Congress, influenced by state involvement in the legislative process, to restrain itself in the exercise of its plenary powers to the proper amount of congressional regulation of the states. Any other reading violates *Garcia*'s clear command that federal judges should not intrude into the political process.[19]

*Garcia,* which did not even involve the Eleventh Amendment, cannot be forced into the express reference mold. Its focus upon the political process to protect the states is federalism as reflected by *Parden* and *Petty,* not the federalism of *National League of Cities.*

The holding of *Garcia* was:

We perceive nothing in the overtime and minimum-wage requirements of the FLSA, as applied to SAMTA, that is destructive of state sovereignty or violative of any constitutional provision. SAMTA faces nothing more than the same minimum wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet.

*Id.* — U.S. —, 105 S.Ct. at 1020, 83 L.Ed.2d at 1036. The rationale behind the Court's conclusion that a state governmental agency was subject to the FLSA was that the states must protect themselves by participation in the political process. Indeed, the Court observed that "the principal and basic limit on the federal commerce power is that inherent in all congressional

---

**17.** *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

**18.** *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

**19.** Certainly Justice Powell in his dissent in *Garcia* interpreted the majority opinion in this fash-

ion. Indeed, what Justice Powell found most troubling was the majority's conclusion "that federal political officials, invoking the Commerce Clause, are the sole judges of the limits of their own power." *Garcia,* — U.S. —, 105 S.Ct. at 1026, 83 L.Ed.2d at 1044. (Powell, J., dissenting).

action—the built-in restraints that our system provides through state participation in federal governmental action. The political process ensures that laws that unduly burden the states will not be promulgated." *Id.* — U.S. —, 105 S.Ct. at 1020, 83 L.Ed.2d at 1037.[20]

*Garcia* stands for the proposition that states retain sovereign authority "only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the federal government." *Garcia* — U.S. —, 105 S.Ct. at 1017, 83 L.Ed.2d at 1033. The admiralty power, like that over commerce, was expressly delegated to the national government by the Constitution. *Garcia* makes clear that federal legislation constitutionally may apply to state activities. In doing so, it restores full force to the Court's earlier decisions in *Parden* and *Petty*. Therefore, the constitutional power rationale that *Parden* applied to uphold FELA's application to the states as an employer still stands.[21]

The Court, supporting its conclusion that "our federalism" requires that the states affirmatively exempt themselves from federal regulation, listed many of the federal regulatory schemes which specifically exempt the states and their subdivisions. Conspicuous by their absence from the Court's partial catalogue are the two statutes at issue in this case: FELA and the Jones Act. Most important for a correct understanding of *Garcia*, however, is that the court chose as its illustration those programs which specifically exempted the states from regulation. In matters within its plenary power—admiralty and commerce—Congress is not required to expressly incorporate the states within the regulatory scheme. The states are already on notice of Congressional authority in those areas because it results from the states' own constitutional cession of power over them to the federal government.

In the context of a plenary power the message of *Garcia* is that Congress intends to act to the full extent of its power—unless it places some limitation upon its own actions. The fact that Congress in the past may not have exercised its delegated powers to their full extent is not sufficient reason to adopt the express articulation doctrine. *Garcia* has not mandated such a course, and I do not believe *Atascadero* compels a different result.

*Atascadero* is a case which arose under the Rehabilitation Act of 1973, an anti-discrimination statute enacted pursuant to the powers granted to Congress by the Fourteenth Amendment. In a sweeping opinion for a divided court, Justice Powell wrote

> in determining whether Congress in exercising *its Fourteenth Amendment powers* has abrogated the States' Eleventh Amendment immunity, we have required *an unequivocal expression of Congressional intent to overturn* the constitutionally guaranteed immunity of the several states.[22]

---

20. The emphasis upon the states' ability to protect themselves by their involvement in the legislative process explains the *Garcia* Court's statement in note 10 that:

> the existence *vel non* of a tradition of *federal* involvement in a particular area does not provide an adequate standard for state immunity.... The recent vintage of this regulatory activity does not diminish the strength of the federal interest in applying regulatory standards to state activities, nor does it affect the strength of the state's interest in being free from federal supervision.

*Id.* — U.S. —, 105 S.Ct. at 1015, 83 L.Ed.2d at 1030.

21. Justice Powell recognized this—even though he disagreed with the conclusion—when he observed: "[t]he Court apparently thinks that the states' success at obtaining federal funds for various projects and exemptions from the obligations of some federal statutes is indicative of the effectiveness of the federal political process in preserving the states' interests...." *Garcia,* — U.S. —, 105 S.Ct. at 1026, 83 L.Ed.2d at 1043 (Powell, J., dissenting).

22. The majority places great store on a recent law review article by Professor Martha Field of Harvard Law School, *Garcia v. San Antonio Metropolitan Transit Authority: The Demise of a Misguided Doctrine,* 99 Harv.L.Rev. 84 (1985), which suggests that the holding of *Atascadero*

> "effectively placed upon Congress the burden of reenacting statutes regulating states if it would have states answer in federal courts to individuals' suits".

*Atascadero,* —— U.S. at ——, 105 S.Ct. at 3146, 87 L.Ed.2d at 178, *citing Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (emphasis added). I believe, however, that *Atascadero* by the use of the very words refers to the extent of state Eleventh Amendment immunity when considering congressional acts under the Fourteenth Amendment.[23]

*Atascadero* was a suit seeking to vindicate rights granted to the handicapped under the Rehabilitation Act of 1973. The Court's solicitude for the sovereignty of the states in the context of a Fourteenth Amendment case is readily understood. The intrusion of the federal judiciary, under the Fourteenth Amendment, into areas traditionally thought to be the prerogative of the states has been the subject of considerable comment.

> [T]he trial judge has increasingly become the creator and manager of complex forms of ongoing relief, which have widespread effects on persons not before the court and require the judge's continuing involvement in administration and implementation.

*Id.* at 115. However, nothing in the article—and certainly nothing in *Atascadero* itself—requires the reenactment of statutes *already interpreted* as having abrogated the Eleventh Amendment immunity of the states.

As I emphasized earlier, both FELA and the Jones Act have already been determined to abrogate state immunity to suit. *See supra* Part III.

**23.** The Court repeatedly makes this clear:

As a result, when acting pursuant to § 5 of the Fourteenth Amendment, Congress can abrogate the Eleventh Amendment without the state's consent. —— U.S. ——, 105 S.Ct. at 3145, 87 L.Ed.2d at 177.

Likewise, in determining whether Congress in exercising its Fourteenth Amendment powers has abrogated the State's Eleventh Amendment immunity, we have required "an unequivocal expression of congressional intent to overturn the constitutionality guaranteed immunity of the several states." *Id.* —— U.S. ——, 105 S.Ct. at 3146, 87 L.Ed.2d at 178. Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermis-

A. Chayes, *The Role of the Judge in Public Law Litigation,* 98 Harv.L.Rev. 1281, 1284 (1976).

In our own Circuit, there have been several striking examples of the degree to which federal remedial decrees issued pursuant to the Fourteenth Amendment have severely restricted the discretion of the States to determine the manner in which their institutions will operate. The complexity and breadth of such orders is exemplified by *Ruiz v. Estelle,* 679 F.2d 1115, *amended in part,* 688 F.2d 266 (5th Cir. 1982), a case in which a comprehensive injunctive decree covering the operation of the Texas Department of Corrections was issued by a federal district court. Other examples of these sweeping equitable orders abound.[24]

*Atascadero* is understandably concerned about abrogation of state immunity in Fourteenth Amendment cases. In the words of Professor Field

> [t]he court initially gave a miserly construction to the [Civil War] amendments precisely because it realized that the

sible in other contexts. *Id.* —— U.S. ——, 105 S.Ct. at 3148, 87 L.Ed.2d at 180 *quoting Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

We have decided today that the Rehabilitation Act does not evince an unmistakable congressional purpose, pursuant to § 5 of the Fourteenth Amendment, to subject unconsenting states to the jurisdiction of the federal courts. —— U.S. ——, 105 S.Ct. at 3150–51, 87 L.Ed.2d at 183.

**24.** *See, e.g., Lelsz v. Kavanaugh,* 710 F.2d 1040 (5th Cir.1983) [class action against Texas Department of Mental Health and Mental Retardation, ongoing in E.D.Tex., civil action No. 5–74–95–CA]; *Valley v. Rapides Parish School Board,* 646 F.2d 925 (5th Cir.1981) [class action of sixteen years duration seeking desegregation of local public schools in Louisiana]; *Gates v. Collier,* 501 F.2d 1291 (5th Cir.1974) [class action seeking to remedy unconstitutional prison conditions in the Mississippi state penitentiaries].

All of these are properly considered as Fourteenth Amendment cases because they are suits which seek the vindication of federal rights that are applicable against the States by virtue of the incorporation of the Bill of Rights through the Fourteenth Amendment.

amendments would significantly shift the state-federal balance of power ...

Field, *Garcia v. San Antonio Metropolitan Transportation Authority: The Demise of a Misguided Doctrine*, 99 Harv.L. Rev. 84,100 (1985). The Fourteenth Amendment to the Constitution, however, has not "divested the states of their original powers [to vindicate constitutional rights] and transferred them to the federal government." *Garcia*, — U.S. —, 105 S.Ct. at 1017, 83 L.Ed.2d at 1033. State courts have concurrent jurisdiction over cases involving the redress of rights guaranteed by the Constitution, and in certain circumstances, the existence of an adequate state remedy for an alleged violation of federal rights may even preclude access to a federal forum. *Parratt v. Taylor*, 451 U.S. 527, 543–44, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420, 433–34 (1981).

Clear statement in the context of the Fourteenth Amendment is imperative, if federal intrusion upon the state's domain is not to "prevent the making of social experiments that an important part of the community desires, in the insulated chambers afforded by the several States." *Truax v. Corrigan*, 257 U.S. 312, 343, 42 S.Ct. 124, 133, 66 L.Ed. 254 (1921) (Holmes, J. dissenting).[25] When however, state experimentation threatens to trench upon areas reserved for the plenary exercise of *federal* power, I believe the state's experiment must fail. So it is when state economic regulations are held to be preempted by the federal commerce power of Art. I § 8; so it must be when a state's assertion of Eleventh Amendment immunity threatens to displace a uniform, federal remedial statute enacted pursuant to the Congress' plenary authority over admiralty.

Admiralty is a fundamental area marked by the constitution in which the states have surrendered their power to the federal government. The plenary power over admiralty, more extensive even than that over commerce, was one of the fundamental precepts upon which the Republic was founded.[26] The states' surrender of sovereignty in this area was present in the plan of the convention from its inception,[27] and has continued unchallenged and unrestricted to the present day. The states have been on notice of the scope of this federal authority since the founding of the Republic. They relinquished it in order that a fledgling nation might build a *national*, sea-going trade. It is not for Texas, after more than one hundred forty years as a member of the Union, to assert that its sovereignty over maritime matters is somehow greater than that which was ceded to the national government by the Constitution.

The Jones Act poses no threat of massive, unanticipated federal intrusion upon the traditional domain of the several states. There was, and is, no need for clear statement on the part of Congress to inform the states of its intention to occupy the field in this area. The entire domain of maritime activities has been occupied by the federal presence since 1789, and exclusive jurisdiction over admiralty appears in the text of the Constitution itself. Art. III § 2. The Jones Act, as an appropriate exercise of the plenary authority of Congress over maritime affairs, provides sufficiently clear notice to the states of the congressional intent. There was no need at the time of the enactment of the Jones Act, at the time of the decision concerning FELA in *Parden*, or at the present time in view of *Employees, Edelman, Garcia*, and *Atascadero*, for Congress specifically to declare that the states were subject to federal court suit

---

**25.** *See also New State Ice Co. v. Liebmann* in which Justice Brandeis observed

> [I]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.

285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).

**26.** *See supra* pp. 7–11.

**27.** *Workman v. Mayor, Alderman, and City of New York*, 179 U.S. 552, 560, 21 S.Ct. 212, 45 L.Ed. 314 (1900); *Cf. Monaco*, 292 U.S. at 322–23, 54 S.Ct. at 747–48.

under the Jones Act. To my way of thinking, then, the Jones Act is sufficient to abrogate Texas' Eleventh Amendment immunity to suit for injuries that arise out of its operation of a ferry system.

### Congressional Treatment of Federally-Employed Seamen

I find unconvincing Texas' argument that Congress could not have intended that the Jones Act should apply to the states since the federal government has not applied the Jones Act to the federal government's seamen. As the federal power over admiralty is plenary, the federal government is entitled to do with it as it will. The question is not what Congress has done with its own employees alone, the question is what has it chosen to do with all other maritime employees. Occasionally Congress has provided that federally employed seamen be covered by the Federal Employees Compensation Act (FECA), 5 U.S.C. § 8101. But this has not always been so when conditions—war conditions—suggest a change to traditional seamen's remedies.[28]

How Congress treats federally-employed seamen simply has nothing to do with its determination that state-employed seamen are covered by the Jones Act.

### Conclusion

It is my view that a substantial and settled body of Eleventh Amendment jurisprudence has established that Congress can abrogate a state's immunity to suit. In both *Parden* and *Employees*, the Court recognized that Congress has the power to bring "the States to heel, in the sense of lifting their immunity from suit in a federal court." *Employees*, 411 U.S. at 283, 93 S.Ct. at 1617. While Congress can induce states to waive their immunity in grant-in-aid programs, Congress is not limited to such indirect action. I believe the Supreme Court has clearly held that the national legislature possesses the power to override the Eleventh Amendment directly, without resort to any theory of state consensual waiver, when Congress acts pursuant to a plenary power given to achieve the framers' goal of uniformity. The Supreme Court has ruled that FELA meets this standard for abrogation of state immunity to suit. In this Jones Act case, involving the same statute, it is not for us to say differently.

Welch's claim as a blue water seafarer should proceed in the Federal Court.

28. *See* for example, *Cosmospolitan Shipping Co. v. McAllister,* 337 U.S. 783, 69 S.Ct. 1317, 69 L.Ed. 1692 *rehearing denied,* 338 U.S. 839, 70 S.Ct. 32, 94 L.Ed. 513 (1949), *overruling Hurst v. Moore-McCormack Lines,* 328 U.S. 707, 66 S.Ct. 1218, 90 L.Ed. 1534 (1946); *Caldarola v. Eckert,* 332 U.S. 155, 67 S.Ct. 1569, 91 L.Ed. 1968 (1947) (cases dealing with seamen on government owned and operated ships under war shipping Administration Agents).